[No. S039871. July 31, 1995.]

Adoption of MICHAEL H., a Minor.
JOHN S. et al., Plaintiffs and Appellants, v.
MARK K., Defendant and Respondent.

## COUNSEL

Janis K. Stocks, Douglas R. Donnelly, Orrick, Herrington & Sutcliffe, William F. Abrams and Carl W. Chamberlin for Plaintiffs and Appellants.

Elizabeth E. Bader, Melisa Bauman Ward, Mary Patricia Hough, Michael Willemsen, Van Deusen, Youmans, Walmsley, Robert R. Walmsley, Ted R. Youmans and Tisha Harman as Amici Curiae on behalf of Plaintiffs and Appellants.

Paula C. Mendell and Carmela F. Simoncini, under appointments by the Supreme Court, for Defendant and Respondent.

Steven A. Schutte, under appointment by the Supreme Court, for Minor.

Robert C. Fellmeth and Kathleen Murphy Mallinger as Amici Curiae on behalf of Minor.

Lloyd M. Harmon, Jr., County Counsel (San Diego), Susan Strom, Chief Deputy County Counsel, and Kathryn E. Krug, Deputy County Counsel, as Amici Curiae.

## OPINION

MOSK, J.—In this appeal we further clarify the circumstances (see *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (hereafter *Kelsey S.*)) in which an unwed biological father has a right under the due process and equal protection clauses of the Fourteenth Amendment to withhold his consent to the biological mother's decision to give their child up at birth for adoption by a third party. We are also asked to consider whether an unwed father can be equitably estopped from attempting to veto such an adoption on constitutional grounds, whether an unwed father is barred as a matter of law from asserting such a veto if he was over age 18 and the mother was under age 18 at the time of conception, and whether children have a Fourteenth Amendment liberty interest in the continuity and stability of their family lives that limits their unwed father's ability to exercise his own Fourteenth Amendment right to veto the adoption.

We conclude that the unwed father in this case did not satisfy the requirements of *Kelsey S.* as they are properly understood, and hence that he

has no constitutional right to veto his child's adoption. The judgment of the Court of Appeal to the contrary must therefore be reversed. In light of this holding, we need not and do not consider the parties' contentions regarding equitable estoppel, the ages of the biological parents at the time of conception, and the interests of children in the stability and continuity of their family lives.

## FACTS

Stephanie H. met Mark K. in December 1988 in Arizona. In February 1990, Mark, then age 20, told Stephanie, then age 15, that he wanted to marry her. She declined to get married until she graduated from high school and until he quit drinking and using drugs. However, they considered themselves engaged at that time. In early July 1990 Stephanie learned she was pregnant with Mark's child. Mark suggested that she have an abortion, but she would not consider it. They also briefly discussed keeping the baby, but finally settled on adoption.

Stephanie came to California with her grandparents in July 1990. While here her aunt introduced her to two friends, John and Margaret S., who were interested in adopting a child. Stephanie told Mark about John and Margaret when she returned to Arizona at the end of July 1990. Around that time Stephanie and Mark were also researching adoption agencies.

In September 1990 Mark and Stephanie began attending birthing classes together, and Mark went to at least one yard sale with Stephanie to buy baby apparel. He also bought a trailer for them to live in together, although they never did. In early October 1990 Mark arranged to have a videotape of Stephanie's ultrasound made.

Mark and Stephanie's relationship started to deteriorate around this time. Stephanie excluded him from the birthing classes. Mark had two violent outbursts involving Stephanie, and after one of these he was arrested on a charge of aggravated assault. Mark quit his job on October 26, 1990. Two days later, on Stephanie's 16th birthday, Mark went into his trailer, which was parked behind Stephanie's mother's house, and attempted to kill himself.

After his suicide attempt, Mark admitted himself into a rehabilitation hospital. While there he decided to stop using drugs, seek stable employment and residence, and continue counseling. He also decided that he did not want to give up his child for adoption and started looking for an attorney to help him obtain custody after the child was born.

Mark and Stephanie had very little contact after his suicide attempt. In January 1991 Stephanie moved from Arizona to San Diego to live with John and Margaret. She gave birth to Michael H. on February 27, 1991. Michael was released from the hospital directly into John and Margaret's custody, where he has remained ever since.

On March 7, 1991, Mark found an attorney who would take his case free of charge. That day his attorney telephoned John and Margaret and learned that Michael had been born. As soon as he found out, Mark asked for custody, sent out some birth announcements, and bought several items, including a car seat, a crib, and some baby clothes.

In April 1991 John and Margaret filed a petition to terminate Mark's legal status as Michael's father. (Fam. Code, § 7662.)[1] Mark subsequently filed a petition to establish a father-child relationship (§ 7630, subd. (a)(1)), and the two proceedings were consolidated (*id.*, subd. (c)). The court concluded that Mark was not a "presumed father" under the statutory definition (§ 7611) and that it would be in Michael's best interest to be adopted by John and Margaret (§ 7664, subd. (b)). It therefore terminated Mark's parental status and allowed the adoption to proceed.

While Mark's appeal from that judgment was pending we filed our decision in *Kelsey S., supra*, 1 Cal.4th 816, in which a majority held that under certain circumstances unwed fathers have a Fourteenth Amendment right to prevent third parties from adopting their biological children. John and Margaret contended, on the basis of certain dicta in that decision, that Mark had no such right because he was over age 18 and Stephanie was under age 18 at the time of conception. The Court of Appeal rejected that contention but reversed the judgment with directions to the trial court to hold an evidentiary hearing on whether Mark had a constitutional right to veto Michael's adoption under *Kelsey S.*

None of the parties petitioned this court for review, but John and Margaret requested that we order the opinion unpublished on the ground that the Court of Appeal erred in rejecting their contention regarding Mark's and Stephanie's ages at the time of conception. (Cal. Rules of Court, rule 979.) We granted their request.

After holding an evidentiary hearing on remand, the trial court concluded in light of our decision in *Kelsey S.* that Mark had a constitutional right to

---

[1]Effective January 1, 1994, the Legislature repealed the Civil Code sections governing adoption and reenacted them as part of the new Family Code. (Stats. 1992, ch. 162, §§ 4, 10.) There is no substantive difference between the relevant sections of the Family Code and their predecessors in the Civil Code.

All further statutory references are to the Family Code unless otherwise stated.

veto Michael's adoption absent a showing that he would be an unfit parent. John and Margaret noticed an appeal.[2]

The Court of Appeal affirmed the trial court's decision. It rejected John and Margaret's contentions that the trial court misinterpreted our holding in *Kelsey S.*, that under the correct legal standard there was insufficient evidence to support the decision, and that Mark was equitably estopped from attempting to assert a constitutional right to veto the adoption. The Court of Appeal declined to consider whether Michael had a Fourteenth Amendment liberty interest in the stability and continuity of his family life with John and Margaret, both because the trial court had not considered the issue and because it was not necessary to the decision. We granted review.

DISCUSSION

I.

There has been some confusion in the lower courts and among the parties in this case regarding the relationship between the two distinct but closely interwoven sources of law that govern the rights and duties of unwed fathers in adoption proceedings—California's statutory scheme and the Fourteenth Amendment to the federal Constitution. To allay this confusion and to place the issues in their proper context, we begin with an overview of these two bodies of law insofar as relevant.

Much of the statutory law governing this case is derived from the Uniform Parentage Act of 1973 (UPA), adopted by our Legislature as section 7600 et seq. of the new Family Code. (See § 7600.) ■ "The UPA provides a comprehensive scheme for judicial determination of paternity, and was intended to rationalize procedure, to eliminate constitutional infirmities in then existing state law, and to improve state systems of support enforcement." (*Michael M.* v. *Giovanna F.* (1992) 5 Cal.App.4th 1272, 1278 [7 Cal.Rptr.2d 460]; 9B West's U. Laws Ann. (1987) U. Parentage Act, comrs. note, pp. 287-290; Legis. Counsel's Dig., Sen. Bill No. 347, 2 Stats. 1975 (Reg. Sess.) Summary Dig., p. 344.)

■ An unwed father's rights and duties under the UPA substantially depend on whether he is a "presumed father" within the meaning of section

---

[2]A determination that an unwed father has a constitutional right to veto adoption absent a showing of unfitness under *Kelsey S.* is not a final judgment in and of itself, nor is it an appealable interlocutory order. (Code Civ. Proc., § 904.1, subd. (a).) Here, however, John and Margaret waived the contention that Mark is unfit by noticing an appeal rather than raising that issue in the trial court. Because of this waiver, the order appealed from was in effect a "final determination of the rights of the parties" from which an appeal may be taken. (*Lyon* v. *Goss* (1942) 19 Cal.2d 659, 670 [123 P.2d 11]; accord, *UAP-Columbus JV 326132* v. *Nesbitt* (1991) 234 Cal.App.3d 1028, 1034-1036 [285 Cal.Rptr. 856].)

7611. (*Kelsey S., supra*, 1 Cal.4th 816, 823 ["Whether a biological father is a 'presumed father' . . . is critical to his parental rights [in adoption proceedings]."]; see also *In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449 [24 Cal.Rptr.2d 751, 862 P.2d 751] [only "presumed fathers" are entitled to custody and reunification services].) Under section 7611, a man who has neither legally married nor attempted to legally marry the mother of his child cannot become a presumed father unless he *both* "receives the child into his home *and* openly holds out the child as his natural child." (§ 7611, subd. (d), italics added.) We recently rejected an unwed father's contention that a man can constructively receive a child into his home within the meaning of this statute. (*Kelsey S., supra*, 1 Cal.4th at pp. 825-830.) Therefore, to become a presumed father, a man who has neither married nor attempted to marry his child's biological mother must not only openly and publicly admit paternity, but must also *physically* bring the child into his home.

If a man is a presumed father, a third party generally cannot adopt his child unless both he and the mother consent. (§§ 8604-8606.) If a man is not a presumed father, however, the situation is quite different. The mother's consent is still required in most cases (*ibid.*), but the father's consent is not required unless he successfully petitions to block the adoption and establish his legal status as the child's father. (§§ 7630, 7662.) Even if he files such a petition, the adoption will proceed over his objection if either the mother or the party seeking to adopt the child successfully petitions for termination of his parental status. (§ 7662.)

If the court finds in such a proceeding that "it is in the best interest of the child that the father retain his parental rights," it must enter an order providing that his consent is necessary for an adoption. (§ 7664, subd. (b).) In making this determination, the court "may consider all relevant evidence, including the efforts made by the father to obtain custody, the age and prior placement of the child, and the effects of a change of placement on the child." (*Ibid.*) If, however, the court finds that it is in the best interest of the child to be adopted by the prospective adoptive parents, it must enter an order stating that the father's consent is not required. (*Ibid.*) This order also "terminates all [the father's] parental rights and responsibilities with respect to the child." (*Ibid.*)

In essence, therefore, our statutory scheme creates three classes of parents: mothers, fathers who are presumed fathers, and fathers who are not presumed fathers. (*Kelsey S., supra*, 1 Cal.4th 816, 825.) Parents belonging to either the first or second class usually have a statutory right to veto adoption by withholding consent regardless of what the court believes to be the child's best interest. (*Ibid.*) However, a biological father who is not a

presumed father has no statutory right to block adoption unless he first proves that it is in the child's best interest that the adoption not proceed. (*Ibid.*) As we noted in *Kelsey S.* (*id.* at p. 824), "the trial court's determination is frequently that the child's interests are better served by a third party adoption than by granting custody to the unwed natural father." (Fn. omitted.)

Here the trial court determined at the first hearing that Mark is not a presumed father under the statutory definition (§ 7611) and that it would be in Michael's best interest to be adopted by John and Margaret (§ 7664). Mark does not contend these conclusions were erroneous. It follows that Mark has no statutory right to withhold consent to Michael's adoption. However, both the trial court and the Court of Appeal concluded that although Mark has no *statutory* right to block adoption by withholding consent, he has a *constitutional* right under *Kelsey S.*, *supra*, 1 Cal.4th 816, to prevent Michael's adoption and to establish his legal status as Michael's father unless John and Margaret prove that he would be an unfit parent. The only issue before us is whether that conclusion is correct.

## II.

■ We held in *Kelsey S.*, *supra*, 1 Cal.4th 816, that an unwed father who has no statutory right to block a third party adoption by withholding consent may nevertheless have a constitutional right to do so under the due process and equal protection clauses of the Fourteenth Amendment and thereby to preserve his opportunity to develop a parental relationship with his child. Under such circumstances, however, the unwed father's constitutional interest is merely inchoate (*Lehr* v. *Robertson* (1983) 463 U.S. 248, 261-263 [77 L.Ed.2d 614, 626-628, 103 S.Ct. 2985]) and does not ripen into a constitutional right that he can assert to prevent adoption unless he proves that he has "promptly come[] forward and demonstrate[d] a full commitment to his parental responsibilities . . . ." (*Kelsey S.*, *supra*, 1 Cal.4th 816, 849.) This is so because "the mere existence of a biological link does not merit . . . constitutional protection" (*Lehr* v. *Robertson, supra*, 463 U.S. at p. 261 [77 L.Ed.2d at p. 626]); rather, the federal Constitution protects only the parental *relationship* that the unwed father has actively developed by " 'com[ing] forward to participate in the rearing of his child' " (*ibid.*) and "act[ing] as a father" (*Caban* v. *Mohammed* (1979) 441 U.S. 380, 389, fn. 7 [60 L.Ed.2d 297, 305, 99 S.Ct. 1760]).

We must decide whether Mark took sufficient steps to transform his inchoate constitutional interest in his potential parental relationship with Michael into a constitutional right that entitled him to block John and

Margaret's efforts to adopt Michael and terminate his status as Michael's father. Our task is made more difficult by the circumstance that here the adoption process began at birth and Michael has been in John and Margaret's custody and care for all of the more than four years of his life. Mark has therefore had little contact with Michael and little opportunity to directly develop a parental relationship with him, and Michael instead experiences only John and Margaret as his parents.

After its hearing devoted to the question whether Mark was entitled to constitutional protection under *Kelsey S.*, the trial court prepared a rather lengthy summary of its findings. In this summary the court declared that during the period between early July 1990, when Mark first learned that Stephanie was pregnant, and October 28, 1990, the day he attempted suicide, "it cannot be said that he was fully committed to his parental responsibilities. While he always acknowledged his paternity, he clearly planned with Stephanie to give the child up. Like many fathers (and mothers) he was initially frightened and eagerly looked for a way out of these responsibilities." During his hospitalization in November 1990, Mark "decided he did not want his child given up for adoption." Despite this decision, however, Mark continued to "speak to Stephanie and even [John and Margaret] as though he still agreed with the adoption" until March 7, 1991, some two weeks after Michael was born, because, according to Mark's testimony, "he did not want to risk the sort of polarization which might totally close the door to further communication."

The trial court found that "After his release from the hospital, and particularly after the birth of his son, Mark's efforts were nothing short of impressive,"[3] and "In the two years since his son's birth, Mark has never wavered in expressing his desire to take on the full responsibility of fatherhood." The court also noted that each of Mark's three attorneys testified that Mark "incessantly, relentlessly urged" them to seek visitation rights. In light of these findings, the court concluded that Mark's "struggle before his hospitalization and the subsequent birth of his son does not counterbalance his truly extraordinary efforts and commitment afterward," and that "In the context of all the facts of this case, his efforts sufficiently demonstrate his full commitment to his parental responsibilities" within the meaning of *Kelsey S.*

---

[3]Between November 1990 and March 7, 1991, Mark sought free legal advice, contacted the media, and requested assistance from local political figures. Because he was unable to find an attorney who would take his case free of charge, Mark researched the law himself and filed a custody petition in Arizona in February 1991. He found an attorney who would take his case on March 7, 1991, and the latter contacted John and Margaret to immediately request custody. He also sent out birth announcements and bought things for Michael as soon as he learned of his birth.

The Court of Appeal held among other things that the trial court had correctly interpreted our decision in *Kelsey S.* as creating a "balancing test," under which courts must weigh "*all* factors against each other . . . weighing positives against negatives to arrive at a determination whether a father 'demonstrated the necessary commitment to his parental responsibilities' " "over the whole course of the proceedings." The Court of Appeal then held there was ample evidence to support the trial court's decision under this standard.

## III.

John and Margaret contend that the trial court and Court of Appeal misinterpreted and misapplied our decision in *Kelsey S., supra,* 1 Cal.4th 816, and that under the correct standard the trial court's findings do not support its decision that Mark "promptly [came] forward and demonstrate[d] a full commitment to his parental responsibilities" and was therefore entitled to constitutional protection. (*Id.* at p. 849.) They focus on that portion of *Kelsey S.* in which we stated that in deciding whether an unwed father is entitled to constitutional protection, "A court should consider all factors relevant to that determination. The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and the circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgment of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.,* italics in original, fn. omitted.)

John and Margaret rightly concede that the quoted language does not mean that an unwed father must continually express an unequivocal desire to raise his child from the very moment he learns of the pregnancy or that he can never take a minute to reflect on the importance of his decision and the responsibilities that will come with it. Rather, they contend that although all the unwed father's conduct is relevant and important, he has no constitutional right to withhold his consent to an at-birth, third party adoption under *Kelsey S.* unless he "promptly" demonstrated a "full commitment" to parenthood *during pregnancy* and within a short time after he discovered or reasonably should have discovered that the biological mother was pregnant with his child, and that he cannot compensate for his failure to do so by attempting to assume his parental responsibilities many months *after* learning of the pregnancy.

We agree with John and Margaret's reading of the quoted language. It is difficult to conceive how our statement that "Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and the circumstances permit" (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849) could be read in any other way. To construe it as Mark does destroys the mandatory force of the word "must" and makes the word "promptly" meaningless. Such a conclusion is particularly inappropriate in view of the fact that we also stressed the importance of timely action both in the paragraph preceding and in the paragraph following the quoted language. In the former we stated that "If an unwed father *promptly* comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his paternal relationship absent a showing of his unfitness as a parent." (*Ibid.*, italics added.) In the latter paragraph we stated that "The statutory distinction between natural fathers and presumed fathers is constitutionally invalid only to the extent it is applied to an unwed father who has sufficiently and *timely* demonstrated a full commitment to his parental responsibilities. Our statutes [citations] are constitutionally sufficient when applied to a father who has failed to make such a showing." (*Id.* at pp. 849-850, italics added and deleted.) John and Margaret's reading of *Kelsey S.* is not only correct, but virtually inescapable.

John and Margaret also contend their reading of *Kelsey S.* serves several important public policy goals. We find their points persuasive. They first assert that an unwed father should be encouraged to promptly inform the biological mother during pregnancy whether he objects or consents to the child's adoption at birth, and that he should be denied constitutional protection after birth if he concealed his views during pregnancy. They stress that during pregnancy the mother must make many important decisions, most importantly whether to have an abortion, to prepare an adoption plan, or to keep the baby, and that she has only a relatively short time to make and implement her choice. It is therefore important that the father give the mother prompt notice whether he plans to object or consent to adoption so that she can evaluate that and other options on an informed basis.

John and Margaret also point out that the mother may well need emotional, financial, medical, or other assistance during pregnancy, particularly if she, like Stephanie, is a teenager. It can scarcely be disputed that prenatal care is critically important to both the mother and the child. (See, e.g., *Matter of Adoption of Doe* (Fla. 1989) 543 So.2d 741, 749 ["Congress [has] found . . . [that] substantial numbers of pregnant women and unborn children are placed at special risk with respect to physical and mental health by

inadequate nutritional or health care."]; *In Interest of Baby Girl K.* (1983) 113 Wis.2d 429 [335 N.W.2d 846, 851] ["Medical authorities have long recognized that prenatal care is important to the eventual health and well-being of an infant."].) To the extent the mother needs such critical assistance and the unwed father is able to provide it, the father, as one of the two individuals responsible for the pregnancy, should be encouraged to do so early on and should not be granted constitutional protection after birth if he has failed to timely fulfill this responsibility. Indeed, if unwed fathers are not encouraged to provide prenatal assistance when they are able to do so, the burden will often shift to the state and therefore to society generally. (*Matter of Adoption of Doe, supra,* 543 So.2d 741, 749 ["The failure of unwed fathers to provide support during pregnancy is certainly a major factor in this public problem and transfers the burden to society at large . . . ."].)

Furthermore, if an unwed father is permitted to ignore his parental role during pregnancy but claim it after birth, it will often be very difficult to know with certainty whether he will be able to successfully contest an adoption until after the child is born. This uncertainty could well dissuade prospective adoptive parents from attempting to adopt the children of unwed mothers who, like Stephanie, have chosen for whatever reason not to keep their child and raise it themselves. And that result would frustrate the state's clear interest in encouraging such adoptions and providing stable homes for children. (See *Kelsey S., supra,* 1 Cal.4th 816, 844 ["There is no dispute that 'The State's interest in providing for the well-being of illegitimate children is an important one.'"]; *Robert O.* v. *Russell K.* (1992) 173 A.D.2d 30 [578 N.Y.S.2d 594, 597] ["without the requirement that the unwed father manifest his interest promptly, parties to an adoption proceeding would have no assurance that an adoption was permanent. Such uncertainty would undermine the State's recognized interest in facilitating sure and speedy adoptions and providing permanent, stable homes for adopted children . . . ."].) The state's interest in this matter is particularly important in light of the large number of children born to unwed parents: some 25 percent of all children born in the United States between July 1989 and July 1990—approximately 913,000 out of 3,900,000—were born out of wedlock. (*Kelsey S., supra,* 1 Cal.4th at p. 830, fn. 6.)

John and Margaret also contend that an adopted child may suffer emotional damage if the unwed father conceals his objection to a third party adoption during pregnancy and the adoptive parents take custody at birth in reliance on the unwed father's apparent consent, but the unwed father then initiates often lengthy legal proceedings after birth in an effort to derail the adoption and remove the child from the adoptive parents' custody. If such an unwed father is allowed to prevail after perhaps years of litigation, during

which time the child will likely come to see the adoptive parents as his "true" parents, the resulting disruption in familial relationships and living arrangements can have a very damaging impact on the child's psychological growth and development.

Experts in child development agree with John and Margaret on this point. In the words of one authoritative treatise on the subject, "Continuity of relationships, surroundings, and environmental influence are essential for a child's normal development." (Goldstein et al., Beyond the Best Interests of the Child (1979) p. 31.) Indeed, we have recognized the harm that children may suffer when they are separated from those they have come to identify as their parents. (*In re Baby Girl M.* (1984) 37 Cal.3d 65, 76, fn. 12 [207 Cal.Rptr. 309, 688 P.2d 918] [when a child remains in the custody of the prospective adoptive parents pending the outcome of protracted litigation, "strong relationships . . . develop[], and breaking those bonds could be harmful to the child"].)

The United States Supreme Court has also recognized this problem. (*Stanley* v. *Illinois* (1972) 405 U.S. 645, 647 [31 L.Ed.2d 551, 556, 92 S.Ct. 1208] [when children are removed from their usual environment they "suffer from uncertainty and dislocation" even if they are later returned to it, and therefore even temporary disruptions can be detrimental].) And many courts in other states have emphasized the importance of stability and continuity in a child's family life and the harm often caused by drastic changes. (See, e.g., *Matter of Kailee C.C.* (1992) 179 A.D.2d 891 [579 N.Y.S.2d 191, 192] ["Bearing in mind a child's need for early permanence and stability, the key to the unwed biological father's constitutional right to consent to the adoption is the prompt assertion of his interest and a manifestation of his ability and willingness to assume custody of the child . . . ."]; *Matter of Adoption of Baby Boy D.* (Okla. 1985) 742 P.2d 1059, 1067-1068 ["Children are not static objects. They grow and develop, and their growth and development require more than day-to-day satisfaction of their physical needs. . . . [¶] This court recognizes that a child's need for permanence and stability, like his or her other needs, cannot be postponed. . . . The need for early assurance of permanence and stability is [therefore] an essential factor in a constitutional determination . . . of whether or not to protect [an unwed father's] potential relationship with his child."].)

Lastly, there can also be little doubt that "the . . . adoptive parents suffer emotionally if the child is separated from them after a prolonged period." (Allen, *Adoption of Kelsey S.: When Does an Unwed Father Know Best?* (1993) 24 Pacific L.J. 1633, 1678; see also *In re Baby Girl Eason* (1987) 257 Ga. 292 [358 S.E.2d 459, 460] [one of the "competing interests of overwhelming value" in cases addressing an unwed father's federal constitutional

right to veto adoption is the interest of the prospective adoptive parents, who often "have developed strong emotional connections through their custody of the child, beginning very soon after birth, [and therefore] have interests they likely value beyond measure"].) It would seem inequitable to give preference to an unwed father who failed to fully grasp his parental obligations in a timely fashion over prospective adoptive parents who have made a significant and continuing effort, both before and after birth, to discharge the responsibilities of parenthood.

In similar circumstances our sister states have likewise insisted that unwed fathers must assume their parental responsibilities promptly during pregnancy. (See, e.g., *Matter of Adoption of Doe, supra,* 543 So.2d 741, 749 [holding that "the failure of [the unwed father] to provide prebirth assistance to pregnant mother, when he was able and assistance was needed, vested [the] mother with the sole parental authority to consent to the adoption of the child and removed from the natural father the privilege of vetoing the adoption by refusing to give consent," in light of "the public policy interests of society in encouraging unwed fathers to assume parental responsibilities"]; *In re Baby Girl Eason, supra,* 358 S.E.2d 459, 462-463 [although an unwed father has an "opportunity interest" in developing a parent-child relationship under the due process and equal protection clauses of the Fourteenth Amendment, that interest "begins at conception" and may be lost "if not timely and diligently pursued"]; *Matter of Adoption of Baby Boy S.* (1991) 16 Kan.App.2d 311 [822 P.2d 76, 78] [affirming decision to terminate unwed father's parental rights and allow adoption because unwed father "made no effort to inquire after the welfare of the mother in her pregnant condition," lived with her only briefly, and did not provide food or money after he learned of her pregnancy]; *Matter of Kailee C.C., supra,* 579 N.Y.S.2d 191, 192 [affirming judgment that unwed father was not entitled to veto adoption when, upon learning of the pregnancy, he quit his job and "essentially became a street person," suggested abortion but acceded to adoption, left the adoption arrangements to the mother's parents, and did not "manifest any interest in the child during the critical period prior to birth and placement," but only "told several friends that he was responsible for the pregnancy and desired involvement in the child's life"]; *Matter of Adoption of Baby Boy W.* (Okla. 1992) 831 P.2d 643, 646 [under Oklahoma law, a court may terminate an unwed father's parental rights and allow adoption without a showing of unfitness if the father fails to prove that he has *both* contributed to the support of the mother during pregnancy *and* contributed to the support of the child after birth].)

## IV.

Mark contends that John and Margaret's reading of *Kelsey S., supra,* 1 Cal.4th 816, would unfairly discriminate between unwed mothers and unwed

fathers. In support of this contention, he notes that all an unwed mother must do to obtain a virtually absolute statutory right to withhold consent to an adoption is to show that she has a biological link with the child by proving that she gave birth to it (§§ 7610, subd. (a), 8604-8606), and that the mother possesses this statutory right after birth even if she has consistently and openly consented to adoption throughout her pregnancy. According to Mark, such disparate treatment would not only conflict with what he asserts is the premise of *Kelsey S.*, i.e., that unwed mothers and unwed fathers are entitled to essentially the same rights in adoption proceedings, but would also violate the equal protection clauses of both the Fourteenth Amendment and article I, section 7, subdivision (a), of the California Constitution.

Mark cites no authority for this contention other than a statement in *Kelsey S.* that "The anomalies under [our] statutory scheme become readily apparent. A father who is indisputably ready, willing, and able to exercise the full measure of his parental responsibilities can have his rights terminated merely on a showing that his child's best interest would be served by adoption. If the child's mother, however, were equally of the opposite character—*un*ready, *un*willing, and *un*able—her rights in the child could nevertheless be terminated only under the much more protective standards of [sections 8604 and 8606]. Such a distinction bears no substantial relationship to protecting the well-being of children. Indeed, it has little rationality." (*Kelsey S.*, *supra*, 1 Cal.4th 816, 847, italics in the original.)

Although Mark's contention seems plausible at first blush, it has at least two fatal flaws. First, we held in *Kelsey S.* that despite its apparent anomalies our statutory scheme passes constitutional muster except "*to the extent* it is applied to an unwed father who has sufficiently and timely demonstrated a full commitment to his parental responsibilities." (*Kelsey S.*, *supra*, 1 Cal.4th 816, 849, italics in original.) As explained in part III, *ante*, the words "promptly" and "timely" in *Kelsey S.* mean within a short time after the father knew or reasonably should have known that the mother was pregnant with his child. In effect, therefore, we rejected the contention that Mark now raises when we decided *Kelsey S.* His quarrel is thus with *Kelsey S.* itself, rather than with John and Margaret's reading of it; and to the extent he now invites us to reconsider *Kelsey S.*, we decline the invitation.

Second, the many public policy justifications that John and Margaret have provided and that we have discussed at some length in part III, *ante*, clearly demonstrate that any disparate treatment resulting from *Kelsey S.* is " 'substantially related' " to a significant number of " 'important governmental objectives,' " and therefore does not unconstitutionally discriminate between unwed fathers and unwed mothers on the basis of sex. (*Caban v. Mohammed*,

*supra*, 441 U.S. 380, 388 [60 L.Ed.2d 297, 304-305], quoting from *Craig* v. *Boren* (1976) 429 U.S. 190, 197 [50 L.Ed.2d 397, 406-407, 97 S.Ct. 451].)

## V.

We conclude that an unwed father has no federal constitutional right to withhold consent to an at-birth, third party adoption under our decision in *Kelsey S., supra*, 1 Cal.4th 816, unless he shows that he promptly came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted within a short time after he learned or reasonably should have learned that the biological mother was pregnant with his child.

Here the trial court found that Mark learned that Stephanie was pregnant with his child in early July 1990, that between July 1990 and November 1990, "*it cannot be said* that he was fully committed to his parental responsibilities . . . [and] he clearly planned with Stephanie to give the child up." (Italics added.) The court further found that although Mark decided in November 1990 that "he did not want his child given up for adoption," he "continued to speak to Stephanie and even [John and Margaret] as though he still agreed with the adoption" until March 7, 1991, some two weeks after Michael was born. In light of these findings, we conclude that under *Kelsey S.* Mark has no constitutional right to withhold his consent to Michael's adoption and that the Court of Appeal erred in ruling to the contrary.[4]

We therefore reverse the judgment of the Court of Appeal with directions to remand the cause to the superior court for entry of judgment against Mark on his claim he has a constitutional right to veto adoption, against Mark on his petition to declare the existence of a father-child relationship (§ 7630, subd. (c)), and in favor of John and Margaret on their petition to terminate Mark's parental rights and adopt Michael (§ 7662).

Lucas, C. J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—Upon learning that his girlfriend, Stephanie H., was pregnant, Mark K. promptly acknowledged paternity; he contributed to the costs of her pregnancy; and he tried to maintain

---

[4]There is no need for yet further evidentiary proceedings on whether Mark is entitled to constitutional protection under *Kelsey S.* because the trial court's existing findings are responsive to and dispositive of this issue. To remand the cause for such further proceedings, moreover, would be to delay resolution of an already lengthy lawsuit and protract the uncertainty it has brought into the lives of all concerned, particularly the minor child, beyond the four-plus years already elapsed.

his relationship with Stephanie until she put an end to it. After researching the law himself, Mark filed a petition in propria persona for custody of his son Michael H. Since then, Mark has never wavered in his efforts to attain that goal. The majority terminates Mark's parental rights in Michael solely because in the early stages of Stephanie's pregnancy Mark did not oppose her plan to have the child adopted. The majority's conclusion is at odds with this court's holding in *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (hereafter *Kelsey S.*) that a biological father who "sufficiently and timely demonstrated his full commitment to his parental responsibilities" had the right to veto his child's adoption. In my view, Mark has met the *Kelsey S.* test.

Nevertheless, I would conclude that *Kelsey S., supra,* 1 Cal.4th 816, should not be applied retroactively, for reasons I shall discuss later. Thus, I agree with the majority, albeit on a different basis, that Michael, who is now four and one-half years old, should remain with the prospective adoptive parents who have provided a home for him since birth.

I

On February 27, 1991, Stephanie H., an unmarried teenager, gave birth to a son, Michael H., in San Diego. Stephanie immediately relinquished Michael to prospective adoptive parents, John and Margaret S. On April 18, 1991, John and Margaret filed three separate actions in the San Diego County Superior Court: an action to terminate the parental rights of Michael's biological father, Mark K.; an action seeking temporary guardianship of Michael; and an action to adopt Michael. Five days later, the trial court appointed John and Margaret as temporary guardians of Michael. (This order is still in effect.)

With respect to the action to terminate Mark's parental rights in his son, the trial court determined that because Mark was not married to the child's mother and had not taken the child into his home and held him out as his own, Mark did not meet California's statutory requirements for being a "presumptive father" and therefore lacked legal authority to withhold consent to his son's adoption. The court then ruled that it would be in the best interest of the child to sever Mark's parental rights and to proceed with the adoption. A judgment to that effect was entered on October 25, 1991. Mark appealed.

On February 20, 1992, while Mark's appeal was pending in the Court of Appeal, this court decided *Kelsey S., supra,* 1 Cal.4th 816. At issue in that case was the constitutionality of the California statutory scheme granting a

"presumed" father the same right as the biological mother to withhold consent to a child's adoption, but allowing termination of the parental rights of a biological father who did not qualify as a "presumed" father simply upon a showing that the adoption would be in the child's best interest. We held that a biological father who had "sufficiently and timely demonstrated a full commitment to his parental responsibilities" had a constitutional right to be treated like a "presumed" father, and thus could veto the child's adoption. (*Id.* at p. 849.) We directed courts to apply this holding to all cases not yet final. (*Id.* at p. 851.)

On August 25, 1992, the Court of Appeal, applying our decision in *Kelsey S., supra,* 1 Cal.4th 816, reversed the trial court judgment terminating Mark's parental rights and remanded the case to the trial court for a hearing on whether under *Kelsey S.* Mark had acted promptly enough and done enough to show his commitment to assume parental responsibilities of Michael.

That hearing occurred in March 1993 and lasted two weeks, during which the trial court heard testimony from various witnesses, including Mark and Stephanie (Michael's biological parents), and Margaret S. (the prospective adoptive mother). The trial court found that Mark had demonstrated "his full commitment to his parental responsibilities" and thus "under *Kelsey S.* . . . . [was] entitled to be treated as though he were a 'presumed father' for the purposes of this adoption." John and Margaret S. filed a notice of appeal from this ruling.[1] The Court of Appeal affirmed. We granted review to decide whether the trial court and the appellate court properly applied our decision in *Kelsey S., supra,* 1 Cal.4th 816, in this case. In the part that follows, I briefly review *Kelsey S.*

---

[1]The ruling, which merely determined that Mark met the standards this court established in *Kelsey S., supra,* 1 Cal.4th 816, thus giving him the right to withhold his consent to the adoption, did not dispose of the action seeking to terminate Mark's parental rights. Therefore, it was not a final judgment, but an interlocutory order, which is not appealable. (Code Civ. Proc., § 904.1.) When a party files a notice of appeal from a nonappealable order, the reviewing court has discretion to treat the purported appeal as a petition for writ of mandate if the technical requirements for mandate petitions are otherwise met. (See *Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 745-746 [29 Cal.Rptr.2d 804, 872 P.2d 143].) Rather than invoking this rule, however, the majority oddly concludes that the appeal here is proper because by filing the notice of appeal from the interlocutory order "John and Margaret waived the contention that Mark is unfit." (Maj. opn., *ante,* at p. 1050, fn. 2.) I doubt that John and Margaret expected their notice of appeal to be a waiver of any future evaluation of Mark's parental fitness. Nonetheless, given this conclusion by the majority, in future cases prospective adoptive parents seeking immediate review of a trial court's ruling that a natural father qualifies to withhold consent to an adoption should file a petition for a peremptory writ rather than a notice of appeal lest the latter course be deemed an abandonment of any challenge to the natural father's parental fitness.

## II

Under California law, a biological father who shoulders the responsibilities of fatherhood by marrying the child's mother, or by actually living with, caring for, and acknowledging the child as his own, is a "presumed" father with the same right as the biological mother to withhold consent to the child's adoption. (Fam. Code, § 7611, subd. (d).)[2] When a father meets these requirements, the adoption cannot proceed unless it is shown that the father has abandoned the child, has been neglectful or cruel to the child, or is otherwise unfit as a parent. (See §§ 7822-7828.) But when a biological father does not qualify as a "presumed" father, a court can terminate his parental rights and free the child for adoption, upon a finding that the proposed adoption will be in the "best interest of the child." (§ 7664, subd. (b).)

We observed in *Kelsey S.* that a biological father who wanted to marry the child's mother or to take the child into his home, care for it, and hold it out as his own, but who was prevented from doing either by the mother's unilateral decisions not to marry him and to place the child in an adoptive home would, under the statutory scheme, be deprived of the right to withhold consent to adoption and to keep the child himself. This, we said, would violate the federal constitutional guarantees of equal protection and due process. (*Kelsey S., supra,* 1 Cal.4th at p. 849.)

*Kelsey S.* did not, however, strike down the statutory scheme for "presumed" fathers; instead, it established a nonstatutory alternative whereby a biological father could qualify for the same parental rights as those afforded by statute to presumptive fathers. As we stated: "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father comes forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother. [¶] A court should consider all factors relevant to that determination. The father's conduct *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by

---

[2]The relevant statutory provisions, formerly in the Civil Code, now appear in the Family Code. Unless otherwise indicated, all further statutory references are to this code.

others.' [Citation.] A court should also consider the father's public acknowledgment of paternity, payment of pregnancy expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849, fn. omitted, original italics.)

Applying these factors to the evidence in this case, the trial court found that Mark had sufficiently "grasped" his parental responsibilities, and that therefore his parental rights could be terminated only upon a showing of his unfitness as a parent. Contrary to the majority's conclusion, the trial court's determination finds ample support in the evidence, as I shall discuss.

### III

Here, settled law (our recent decision in *Kelsey S.*, *supra*, 1 Cal.4th 816) must be applied to the facts of this case. Consequently, our task " 'begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted' " to support the trial court's ruling. (*Estate of Leslie* (1984) 37 Cal.3d 186, 201 [207 Cal.Rptr. 561, 689 P.2d 133].) That ruling is presumed correct, and "all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) In other words, the evidence must be viewed in the light most favorable to the prevailing party. (*Sanchez-Corea* v. *Bank of America* (1985) 38 Cal.3d 892, 907 [215 Cal.Rptr. 679, 701 P.2d 826]; *Munoz* v. *Olin* (1979) 24 Cal.3d 629, 635 [156 Cal.Rptr. 727, 596 P.2d 1143].) Because the majority provides only a cursory review of the relevant evidence, I give a detailed summary.

In December 1988, Mark K. and Stephanie H. met and began dating in their hometown of Prescott, Arizona. In February 1990, Mark proposed marriage to Stephanie, and they considered themselves to be engaged, planning to marry after Stephanie had finished high school. In early July, when Stephanie was 15 and Mark 20, Stephanie discovered she was pregnant. Mark testified the news "shocked and scared" him, and he and Stephanie did not know what to do. Initially, he suggested abortion because of their youth and lack of financial resources, but Stephanie rejected the idea outright. When Mark suggested moving up their wedding date, Stephanie replied she was not ready for parenthood and did not want to leave school.

A couple of weeks later, Stephanie left for San Diego to visit relatives. They introduced her to family friends, John and Margaret S., who expressed interest in adopting her as yet unborn child. Later, back in Arizona, Stephanie mentioned the adoption plan to Mark, who went along with it.

During the summer of 1990, Mark and Stephanie began living together, initially at the home of Mark's mother, later at the house of Stephanie's

parents. Mark testified that during this time he made small contributions toward household expenses from the $190 he earned each week washing dishes at a local restaurant. He also bought some baby items at a yard sale. In late August, Mark decided that he and Stephanie needed a place of their own, so he bought a trailer, which he parked behind the house of Stephanie's parents. Stephanie never moved into the trailer, however.

In September 1990, Stephanie and Mark began attending birthing classes together. They also enrolled in prenatal nutrition classes and applied for Medicaid. Mark accompanied Stephanie to her medical appointments. At one medical appointment in October, Mark paid to have a sonogram made of the developing fetus. Mark testified that after seeing the sonogram he really began "to warm up to the idea of fatherhood," and he suggested to Stephanie that they "just go straight through with it" and keep the child. Stephanie testified that by October 1990, she began to feel smothered by Mark's increasing attention toward her. One day, she threw his things into the hallway and locked him out of their bedroom. Mark pounded on the bedroom door, seeking admittance; in the process, he cracked the door frame. After this incident, Stephanie refused to let Mark go to birthing classes with her. When he did show up, she persuaded the staff not to admit him.

Late in October 1990, during an argument over his refusal to make a videotape of the sonogram for Stephanie's family, Stephanie "rushed" at Mark with a pen. He pushed her down on a chair, bruising her arm. She had him arrested. Mark, depressed by the deterioration of his relationship with Stephanie, attempted suicide and was hospitalized. Mark described this event as the "turning point" in his life; he resolved to get his life together and to keep and raise his child.

While Mark was still recovering in the hospital, Stephanie moved to her grandparents' home in Mesa, Arizona. Mark testified that after the move Stephanie limited communications with him to just a few times. On those occasions, Mark avoided any mention of his opposition to the planned adoption because, as he testified, he did not want "to risk the sort of polarization which might totally close the door to further communication."[3] Mark did, however, take several steps in an effort to secure his parental rights.

---

[3]Mark gave this same reason for not making clear to the prospective adoptive parents, John and Margaret S., his opposition to the planned adoption. Nonetheless, there is evidence suggesting that Mark made his views known to Margaret five days before Christmas 1990 in a telephone conversation that lasted over an hour. According to Mark, he had asked Margaret during this conversation if she and John would fight him if he sought custody of the child. Margaret denied that Mark ever raised the issue of custody. But other evidence presented at the hearing seems to contradict Margaret's recollection of her discussion with Mark. At one point, Margaret testified that while speaking with Mark on the telephone in December 1990,

Thus, in November 1990, Mark began contacting various politicians and media personalities to find out what he could do to contest the adoption and gain custody of his child. He also talked to Legal Aid attorneys and to private lawyers, but he was unsuccessful in finding anyone to take his case. Undeterred, Mark researched the law himself and drafted his own petition asserting paternity and seeking custody of his yet unborn child. He filed the petition in an Arizona court on February 27, 1991. That same day, unbeknownst to Mark, Stephanie gave birth in San Diego to a son, Michael.

A week later, Mark learned of his son's birth from a lawyer who, after agreeing to represent Mark in the Arizona custody case, had telephoned John and Margaret S., the prospective adoptive parents. Mark immediately had the complaint in the Arizona custody case served on John and Margaret in San Diego and also on Stephanie at her last known residence with her grandparents in Mesa, Arizona. In the ensuing five weeks, before John and Margaret commenced their court actions to terminate Mark's parental rights and to adopt Michael, Mark made repeated demands on them and on the San Diego Department of Social Services for custody of Michael.

In the two years between Michael's birth and the evidentiary hearing, Mark established a home, maintained steady employment, and continued his legal efforts to prevent the adoption and to gain custody of his son.

Based on all this evidence, the trial court made several findings, including these: "Mark conceived this child in love (however ill-fated), attempted to maintain a partnership with the mother throughout the pregnancy (however unwanted that partnership became to her), and has fought unyieldingly for custody since [Michael's] birth."

"After [Mark's] release from the hospital, and particularly after the birth of his son, Mark's efforts were nothing short of impressive. Beginning with relatively little knowledge or experience, he acted with a tenacity that demonstrates undeniable commitment and speaks well of his ability to weather the frustrating demands of parenthood."

"In the two years since his son's birth, Mark has never wavered in expressing his desire to take full responsibility of fatherhood. He defended against the action to terminate his parental rights, and pursued his own paternity action. Testimony from three of his attorneys establishes that he incessantly, relentlessly urged them to seek visitation for him . . . [but] [h]is efforts for custody or court ordered visits were consistently resisted by Stephanie and [by John and Margaret]."

she used a legal pad to make notes of what was said. The word "custody" appears in those notes.

The trial court ruled: "In the context of all of the facts of this case [Mark's] efforts sufficiently demonstrate his full commitment to his parental responsibilities [and thus] under *Kelsey S.* he is entitled to be treated as though he were a 'presumed father' for the purposes of this adoption."

The trial court's ruling, which the Court of Appeal upheld, is supported by substantial evidence.[4] As set forth above, Mark acknowledged paternity, he contributed to the costs of Stephanie's pregnancy commensurate with his ability to do so, he stayed with Stephanie and tried to provide her with emotional support until she ended the relationship, he took prompt legal action to gain custody of Michael, and he has never wavered in his pursuit of custody. Thus, by his conduct both before and after Michael's birth, Mark has done everything that *Kelsey S., supra,* 1 Cal.4th 816, deemed pertinent in determining whether a biological father has made a full commitment to assume his parental responsibilities.

Notwithstanding the strong evidence supporting the trial court's ruling that Mark was a *"Kelsey S."* father, the majority reaches a contrary conclusion. Why? That is the question I now address.

---

[4] In reaching this conclusion, I have not overlooked conduct by Mark that the majority refers to as "violent outbursts," nor have I ignored his attempt at suicide. Although these incidents may bear on Mark's *fitness* as a parent, they are not particularly probative of the quite different issue presented here—whether under *Kelsey S., supra,* 1 Cal.4th 816, 849, Mark has demonstrated *willingness* to assume parental responsibilities for his child.

As yet another instance of improper conduct by Mark, the prospective adoptive parents point to the fact that Stephanie was only 15 years old when she became pregnant by Mark, then 20. They cite a statement in *Kelsey S.* specifically excluding from its holding those situations in which a man has impregnated a woman by "nonconsensual sexual intercourse." (*Kelsey S., supra,* at p. 849, fn. 14.) Because our law deems unlawful sex with a minor to be "nonconsensual" (see Pen. Code, § 261.5 [defining statutory rape]), they argue that as a matter of law Mark cannot qualify for the more favorable treatment afforded natural fathers under *Kelsey S.* This exact issue, however, was decided adversely to the prospective adoptive parents by the Court of Appeal in its initial decision in this case, filed on August 25, 1992. There, the Court of Appeal concluded that footnote 14 of *Kelsey S.* did not pertain to statutory rape but only to forcible rape, and that therefore the fact that Mark was 20 when he impregnated 15-year-old Stephanie did not disqualify him from obtaining the full rights of parenthood under *Kelsey S.* Because that conclusion by the Court of Appeal was necessary to its decision to remand the matter to the trial court in light of *Kelsey S.,* and we did not review that initial decision, the Court of Appeal's interpretation of footnote 14 resolves that issue for purposes of this case. (See *Kowis v. Howard* (1992) 3 Cal.4th 888, 892-893 [12 Cal.Rptr.2d 728, 838 P.2d 250] [explaining the "law of the case" doctrine].) I note, parenthetically, that in apparent response to footnote 14 in *Kelsey S., supra,* 1 Cal.4th 816, 849, the Legislature recently enacted section 7611.5. Under this statute, the effect of footnote 14 in *Kelsey S.* in cases involving unlawful sex with a minor is limited to those situations in which the father is convicted of statutory rape and "the mother was under the age of 15 years and the father was 21 years or older at the time of conception." (§ 7611.5, subd. (b).)

## IV

The majority never evaluates Mark's conduct against the various factors this court set forth in *Kelsey S.*, *supra*, 1 Cal.4th 816, 849, to determine whether he is entitled to be treated as a "presumed" father. In *Kelsey S.*, this court stressed the importance of considering "[t]he father's conduct both *before and after* the child's birth . . . ." (*Ibid.*, original italics.) Of significance are the father's emotional support for the mother during her pregnancy; his "public acknowledgment of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so"; and prompt legal action by him to gain custody of the child. (*Ibid.*) Yet the majority does not consider a single one of these factors. There is no mention of Mark's acknowledgment of paternity; his attempts to provide Stephanie with emotional support; his financial contributions, commensurate with his ability, to the costs of Stephanie's pregnancy; his impressive efforts in researching the law and drafting his custody petition; and, following the birth of his son, his continued pursuit of legal custody.

Instead, the majority rests its decision on this one statement by the trial court: "Looking at the time period between conception and Mark's hospitalization, it cannot be said he was fully committed to his parental responsibilities. While he always acknowledged his paternity, he clearly planned with Stephanie to give the child up." When read in context of all of the trial court's findings, however, it becomes clear that in making this statement the trial court did not suggest that Mark had undertaken no actions early in Stephanie's pregnancy to demonstrate his commitment to parental responsibilities. Rather, it was merely an observation, and a correct one, that until Mark's hospitalization at the end of October 1990, which was late in the fifth month of Stephanie's pregnancy, he did not object to Stephanie's plan to have their child adopted by John and Margaret S. Nonetheless, the majority seizes upon this one statement by the trial court in faulting Mark for not objecting in the early stages of Stephanie's pregnancy to her plan to relinquish their child for adoption. (Maj. opn., *ante*, at pp. 1054-1055.) But *Kelsey S.*, *supra*, 1 Cal.4th 816, never suggested that a biological father could forfeit his chance to obtain the legal rights of parenthood simply by acquiescing to adoption in the early months of the mother's pregnancy but then changing his mind later in the pregnancy, here the fifth month.

The majority's decision creates a dilemma for a biological father: if in the early stages of the mother's pregnancy he vigorously opposes the mother's decision to relinquish their child for adoption, he runs the risk of irreparably damaging his relationship with the mother and causing her emotional upset, quite the opposite of the emotional support he must give under *Kelsey S.*,

*supra*, 1 Cal.4th 186. If, on the other hand, he initially acquiesces in the mother's decision to place the child for adoption, hoping to change her mind before the child is born, he has, under the majority's holding, forfeited his right to object later in the pregnancy to the child's adoption.

To justify its departure from *Kelsey S., supra*, 1 Cal.4th 816, the majority states "that during pregnancy the mother must make many important decisions, most importantly whether to have an abortion, to prepare an adoption plan, or to keep the baby, and that *she has only a relatively short time to make and implement her choice.*" (Maj. opn., *ante*, at p. 1055, italics added.) Thus, the majority reasons, an unwed father must give the mother "prompt notice whether he plans to object or consent to adoption *so that she can evaluate that and other options on an informed basis.*" (*Ibid.*, italics added.)

The majority is wrong in asserting that a pregnant woman has "only a relatively short time" to consider the options of keeping her baby or relinquishing it for adoption. Even after agreeing to adoption, the mother can months later legally revoke her consent to the planned adoption. (See § 8814.5 [originally permitting revocation of consent to an adoption for 120 days but reducing that to 90 days effective January 1, 1995].) Since the majority acknowledges the mother's right to do so (maj. opn., *ante*, at p. 1059), it is puzzling why the majority insists that the mother has "only a relatively short time" in which to make her decision and that therefore the father must decide in the early stages of the mother's pregnancy whether to object or consent to adoption.[5]

As further justification for its holding, the majority states that a biological father who fails to object to adoption early in the mother's pregnancy should not be allowed to prevail "over prospective adoptive parents who have made a significant and continuing effort, both before and after birth, to discharge the responsibilities of parenthood." (Maj. opn., *ante*, at p. 1058.) In that situation, the majority says, the parental rights of the biological father must give way to "the state's clear interest" in encouraging adoptions. (Maj. opn.,

---

[5]The majority is correct that a pregnant woman who wants to have an abortion is under a time constraint to do so. Generally, an abortion can be performed only within the first two trimesters of a pregnancy (that is, before the seventh month). (See *People* v. *Davis* (1994) 7 Cal.4th 797, 816 [30 Cal.Rptr.2d 50, 872 P.2d 591] (conc. opn. of Kennard, J.), and *Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705].) But the majority never explains why this time constraint on a pregnant woman's decision to choose abortion over carrying a child to full term leads the majority to conclude that the unwed father must decide early in the mother's pregnancy that he does not agree to adoption. In any event, this is an odd case in which to fashion such a rule. Here, Mark's failure to make up his mind about adoption early in Stephanie's pregnancy had no effect on her decision to rule out abortion, which she did in July 1990, during the second month of her pregnancy and before she and Mark had even considered placing their child for adoption.

*ante*, at p. 1056.)[6] I readily acknowledge that the state's interest in providing for the welfare of children born to unwed parents is a compelling one. Adoption is a means of bringing stability to the lives of these children and securing for them loving homes. But the state's strong interest in adoption arises only when a child's biological mother and father are unfit or unable to care for the child. Therefore, in the case of a *"Kelsey S."* father (an unwed biological father who comes forward to assume parental responsibility for his child before the child's birth), the state has an interest in the child's adoption only if the father is proven to be an unfit parent.

Unlike the majority, I would uphold the trial court's ruling, affirmed by the Court of Appeal, that Mark is a *"Kelsey S."* father. As I have discussed, there is ample evidence in the record to support the trial court's decision. Nevertheless, for reasons given below, I am of the view that, contrary to this court's directive in *Kelsey S.*, *supra*, 1 Cal.4th 816, that decision should not be applied retroactively.

## V

We made our decision in *Kelsey S.*, *supra*, 1 Cal.4th 816, retroactive to all actions to terminate the parental rights of an unwed father that were not yet final on February 20, 1992, the day of its filing. We did so in these brief sentences: "In recognition of the importance of prompt resolution of adoption proceedings, we find it necessary to explain the applicability of our decision in this action to other cases. 'The general rule that judicial decisions are given retroactive effect is basic in our legal tradition.' (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978 [258 Cal.Rptr. 592, 772 P.2d 1059].) We have also recognized, however, that narrow exceptions to the general rule of retroactivity may sometimes be justified for compelling reasons of fairness and public policy. (*Id.* at p. 983.) No such reasons warrant any exception to a retroactive effect of our present decision." (*Id.* at p. 851.)

---

[6]The majority also asserts that permitting an unwed father to contest an adoption after the child is born might "dissuade prospective adoptive parents from attempting to adopt the children of unwed mothers who, like Stephanie, have chosen for whatever reason not to keep and raise their child themselves." (Maj. opn., *ante*, at p. 1056.) The majority's concern seems to be baseless. According to recent data, the number of couples seeking to adopt healthy infants far exceeds the number of available infants. (See Gubernick, *How Much Is That Baby in the Window?* (Oct. 14, 1991) Forbes, at p. 90 [citing the National Committee for Adoption's estimate of a million couples looking for children to adopt]; Reid, *Abortion and the Adoption Option; What the Numbers Show About Women's Choices*, Wash. Post (Aug. 15, 1989) p. Z6 [noting the "huge supply-and-demand gap in the adoption system" of "at least 40 potential families for each baby currently placed for adoption"]; Bodnar, *Adoption: The Long and Costly Road* (Aug. 1992) Kiplinger's, at p. 68 [stating that the wait for a child can be 5 years or longer].)

I joined this court's retroactivity holding in *Kelsey S.*, *supra*, 1 Cal.4th 816. Now, however, "I feel myself bound to state that I must, when I decided that case, have seen it in a point of view, in which, after most laborious consideration, I cannot see it now." (Lord Eldon, L.C., *Ex parte Nolte* (1826) 2 Glynn & Jam. 295, 307.) In a nutshell, "The matter does not appear to me now as it appears to have appeared to me then." (Bramwell, B., *Andrews* v. *Styrap* (Ex. 1872) 26 L.T.R. (N.S.) 704, 706.)

This case vividly illustrates why we should not have made *Kelsey S.*, *supra*, 1 Cal.4th 816, retroactive. Given that holding, the trial court had no choice but to rule that, having found that Mark satisfied the test of *Kelsey S.*, Mark had the right to veto Michael's adoption by John and Margaret S., the prospective adoptive parents with whom Michael had lived since his birth (two years at the time of the trial court's ruling). That the trial court was troubled by having to apply *Kelsey S.* to a case such as this, in which family relationships had been formed in reliance on law predating *Kelsey S.*, is apparent from this statement in the court's findings: "[B]ased on the timing of this case, a good and loving couple have unavoidably bonded with this child over the last two years. This decision threatens undeserved and painful disruption for both them and the child."

Since then, as the case wended its way through the Court of Appeal and this court, more than two years have passed, and Michael is now four and one-half years old. To remove Michael at this stage from the only family he has ever known and to turn him over to Mark, Michael's biological father but, through no fault of his own, a stranger to Michael, would disrupt Michael's emotional and psychological universe for reasons that young Michael would likely be incapable of understanding or accepting.

Precisely to avoid such a result, the Louisiana Supreme Court, in enunciating a rule similar to the one we thereafter adopted in *Kelsey S.*, *supra*, 1 Cal.4th 816, refused to apply that rule to pending cases. (*In re Adoption of B.G.S.* (La. 1990) 556 So.2d 545.) The court explained: "In perhaps no other area of the law is the interest in finality and certainty greater than in the area of adoption. Consequently, if our holding were to be given retroactive effect, it could lead to disruption of established, settled families in favor of the placement of children with what now amount to strangers." (*Id.* at p. 559; see also *Caban* v. *Mohammed* (1979) 441 U.S. 380, 415-416 [60 L.Ed.2d 297, 321-322, 99 S.Ct. 1760] (dis. opn. of Stevens, J.) [expressing the view that the "reliance interests" of adoptive families should foreclose retroactive application of the high court's decision in *Caban* holding that an unwed father who had lived with his children and their mother had a constitutional right to withhold his consent to the children's adoption]; *People in Interest of*

*C.A.K.* (Colo. 1982) 652 P.2d 603, 607 [declining to give retroactive effect to a new rule requiring proof by clear and convincing evidence of the grounds for terminating parental rights: "By the time a termination proceeding has wound its way through appellate proceedings, no one benefits from a retrial of the facts that served as the basis for the termination. In the context of a parental termination proceeding, finality of decision outweighs retroactive application of a new standard of proof."].)

This case demonstrates that this court's retroactivity holding in *Kelsey S.*, *supra*, 1 Cal.4th 816, 851, far from ensuring the "prompt resolution of adoption proceedings," has instead prolonged the adoption proceedings in this case and no doubt in other cases as well. In cases such as this one, the retroactive application of *Kelsey S.* requires trial courts essentially to start the proceedings over again years after they were first begun and to revisit issues already decided under the law existing before this court's decision in *Kelsey S.* No form of litigation, however, is less suited than an adoption proceeding to the delay caused by retroactive application of a new rule of law. A child's emotional growth and development do not wait for the law to take its sometimes ponderous course before reaching a decision. A child cannot be put on hold. From birth onward, a child forms its world and attaches itself to the persons nurturing the child. That world and those attachments can be severed only at great cost to the child.

As the courts of other states have recognized, these compelling reasons ultimately but decisively weigh against the retroactive application of rules that would disrupt and delay ongoing adoption proceedings. I am persuaded by these authorities that we should have made our holding in *Kelsey S.*, *supra*, 1 Cal.4th 816, *prospective* in its effect, applying it only to actions seeking to terminate a biological father's parental rights that had not yet gone to trial. Because in this case the trial court had already entered judgment terminating Mark's parental rights before we decided *Kelsey S.*, I would not apply the *Kelsey S.* rule. Mark, of course, is not to blame for this state of affairs, and in a perfect world his constitutional rights would have been recognized in time for him to be united with his son, Michael, before Michael had established his emotional and psychological ties to the prospective adoptive parents. That time, however, has long since passed. Mark's rights, important though they are, and impressive as his efforts have been in pursuing custody of Michael, cannot be given effect without also considering the emotional impact on Michael. In balancing the various competing rights, I would conclude that ensuring the continued stability of Michael's emotional and psychological well-being must outweigh giving full retroactive effect to Mark's rights under *Kelsey S.*

Because of my view that *Kelsey S., supra*, 1 Cal.4th 816, should not be applied retroactively, I join the majority in holding that four-and-one-half-year-old Michael H. should remain in the home of his prospective adoptive parents, John and Margaret S.

Respondent's petition for a rehearing was denied September 28, 1995. Kennard, J., was of the opinion that the petition should be granted.