MEMORANDUM OF DECISION
CT Page 5821
This case presents a petition for the termination of the parental rights of Eileen E. and Brian H.. who are the biological parents of the minor child, Moriah P. The minor child, Moriah, born April 15, 1991, is presently seven years of age. She has lived for the past year with specialized care foster (intensive therapeutic foster care) parents who wish to continue to care for her if the parents' rights are terminated. The child, by all accounts, has had a tumultuous, transient life, both with her mother and under DCF care. Even with medication, she can be very aggressive, self-mutilating, destructive, with impulse control and sexualized behavior inappropriate to her age. She cannot be left alone for even an hour. She requires extraordinary parenting, patience, structure, nurturance and affection; virtually twenty four hours a day. Even at night she is often unable to sleep and wakes with nightmares.
The male biological parent of Moriah has never parented her, supported her or inquired about her welfare. He is, solely, the male progenitor. He has, by any definition, abandoned her. He has not participated in these proceedings
The court finds that the mother has appeared and has a court appointed attorney who has vigorously and effectively represented her in these proceedings. The father has been served in accordance with earlier court orders and has failed to appear. Appointment of counsel would serve no useful purpose. He has actual notice that the Department of Children and Families is involved with his daughter, but failed to keep an appointment to provide information and to learn of the circumstances of his child's situation. InMichael H. v. Mark K, 898 P.2d 891, 896 (Cal. 1995) the California Supreme Court held that federal Constitutional protection does not attach for purposes of preventing an adoption, unless the natural father can prove "that he has promptly come forward and demonstrated his full commitment to his parental responsibilities, saying ". .the federal Constitution protects only the parental relationship that the unwed father has actively developed. ."(citingLeher v. Roberson, 463 U.S. 248, at 261 (1983). In the present case, the court concludes that since the male biological parent has failed to come forward and actively develop a relationship with his child, the appointment of counsel for him is unnecessary.
FACTUAL FINDINGS;
CT Page 5822
The court having read the verified petitions, the social studies, the various documents entered into evidence and having heard the testimony of various case workers, makes the following findings by clear and convincing evidence. The court has jurisdiction in this matter; there is no pending action affecting custody of the child in any other court.
FACTS:
The mother, Eileen B., attended the hearing with counsel, cross examined the witnesses and contested the petitioner's case and is in opposition to the termination of her parental rights. The court finds the following relevant facts. The child was born on April 15, 1991. The parents were never married. The male biological parent, Brian, has been convicted of attempted murder and has served a five year sentence. He is currently on probation and may be a student in New York state. He last saw Moriah when she was two weeks old.
The child's mother, Eileen, is presently almost twenty five years of age. Both Eileen and her parents testified in this case. Eileen has had a very conflicted relationship with her parents. Both of her parents are employed. Eileen has few memories of her childhood. Her principle recollection is that her father was an alcoholic.
Her father testified as a witness for Eileen. He indicated that Eileen was a happy-go-lucky kid who was disciplined by time-outs, standing in the corner and an occasional slap on the rear end.. He admits that he had a drinking problem almost twenty years ago. He was treated at a regional substance abuse facility. He said he was off the bottle for almost two and a half years. He now has a couple of shots or a beer after work. He admits to one conviction for driving while intoxicated and to having been convicted in the Federal court of having received a bribe. He had been working for the federal government in a federal property facility. He served four months in a federal prison camp in 1994. He had no idea why Eileen ran away as a child.
Eileen's mother testified that she and Eileen used to have a very good relationship, but that she was closer to her father and ". .then something seemed to change." She admits to having separated from her husband at one time and that she used to ". .mouth off to him about his drinking." When asked how her CT Page 5823 husband's drinking affected the family, she responded "I can't answer that. He never acted inappropriately." She sees nothing in their parenting that might have led to serious problems in their daughter, nor can they account for her teenage difficulties. The court concludes that both parents are in serious denial with respect to their interpersonal relationships and the extent of the family dysfunction. Neither credibly explained Eileen's early years or her level of difficulty.
Neither of the parents had any knowledge, indeed, were in disbelief, about events which Eileen did recall about her early years. Eileen recalls that her maternal grandparents both died of alcoholism. She said her father's side of the family has lots of alcoholism and that her father is an alcoholic. She reports her only sister to be an alcoholic.
She herself began the use of cocaine at thirteen and alcohol at fourteen years of age. She told Dr. David Mantell, the clinical psychologist, that she had been raped at age eleven and later, by a friend of her parents, at age fifteen. She reported an early childhood memory of her mother not permitting her to wear regular clothes and she had to wear only underwear. She reports her father had an affair with a baby sitter, and on another occasion, made sexual advances, groping one of her friends on the breast. She recalls him hitting her and knocking her over a baby gate.
She reports that on another occasion, when she was older and had her own children, her father had been the babysitter for her when she went to work. When Eileen came home from work, her father was drunk and asleep; the children were naked and the house was disordered. She told the psychologist that she does not trust her father with the children.
While Eileen's parents could not identify anything that would emotionally harm their daughter, they committed her on an involuntary commitment to Natchaug Hospital, a private psychiatric facility, when Eileen was thirteen. Neither parent could articulate why she was there, nor, what, if anything, had contributed to her emotional problems except "pot." DCF identifies the problems which resulted in her hospitalization as "behavioral, drug/alcohol and out of control behaviors." The social studies (Exhibit 18 and 19) report that Eileen had five admissions to Natchuag Hospital between ages thirteen and nineteen. Whether that is true or not, Eileen did have at least CT Page 5824 two psychiatric hospital admissions as a teenager.
Eileen quit school in the eleventh grade. She was suspended from school — approximately thirty times for alcohol and drug use. (Exhibit # 5). She has used cocaine, marijuana and alcohol, heavily, in the past. She reports that as of July, 1996, when she was in a substance abuse evaluation, at the direction of DCF, it was the first time she wanted to quit. She said she has never had a problem with substance abuse in her relationships, since all of her partners also abused substances. She was twenty three years of age at the time she decided to quit. She had three children by three different paternities, she was unmarried, impaired, and her children had been removed from her care.
Eileen was seventeen when she had her first child, Moriah. She had apparently lived with the father for a year prior to the birth of their child. As earlier indicated, he was out of the picture when Moriah was two weeks old.
Eileen then developed a romantic interest in Keith C., who was physically and emotionally abusive to Eileen over the course of their five year relationship. Her parents would not let Keith into their home. Her father described him as thick-headed, young wild, stupid and crazy. He said at one point he had hit Eileen and then he got into a fist fight with Keith. Eileen moved in with Keith. They had a child, Kara in May, 1992.
Eileen reports that Keith was abusive and was engaged in criminal activity. His record of arrest and convictions is impressive. He has been incarcerated on at least seven occasions, the most recent being in August of 1994 when he was sentenced for burglary in the second degree, to five years in jail, execution suspended after two years with five years of probation (Exhibit #16). DCF reports that Keith has been incarcerated since 1993 for assault. He beat a neighbor to the point of hospitalization. For that offense he was sentenced to five years in jail, four years to serve, five years probation. He has recently been released to a half-way house. As of the date of this trial, Eileen has hooked up with him again and intends to marry him. They are currently living together. They have both consented to the termination of their parental rights to the child, Kara.
A third child, Chelsea, was born in May of 1995. This child was conceived and born while Keith was incarcerated. The father of this child, one Ricky J., has not participated in the life of CT Page 5825 the child. Little is known to DCF about this male biological parent. Eileen has consented to the termination of parental rights to this child and the father's rights were terminated on December 4, 1997 (Potter, J.).
All three children had been removed from Eileen's care in March, 1996. DCF had been involved with the family since 1993. She was being seen bi-monthly by a DCF social worker. Eileen was referred to the local Youth and Family Services program for a parent aide to assist her in parenting her young children. Eileen was terminated for lack of compliance. Eileen was referred to a local hospital mental health clinic for mental health issues and to a substance abuse program. Eileen did not faithfully attend.
The children moved regularly during their infancy. After Kara's birth, Eileen and the children lived with her parents, then the moved to Keith's brother's home, then back to her parents' home, then back with his brother, then she got her own apartment in Putnam. When Keith went to jail for two or three months, she moved back with her parents, and then she lived with Keith's sister, then she and Keith got another apartment in Danielson. When Eileen worked nights, as did her mother, Eileen's father took care of the kids. Eileen acknowledged to Dr. Mantell that she was uncomfortable leaving the children with her father.
Dr. Patricia Hanley was qualified at trial as an expert in child psychology. She is Moriah's therapist. She testified that things happened to this child before she was removed to foster care that significantly traumatized this child.[2] The child's behavior was extreme. The child was diagnosed with post-traumatic stress disorder and reactive attachment disorder.
Dr. Hanley testified that reactive attachment disorder is thought to be caused by a couple of concurrent conditions. First, the child was subjected to persistent neglect of her emotional needs and, secondly, she was unable to attach to a primary caretaker because the primary caretaker was not trustworthy. At a very early age, the child's physical and emotional needs were not consistently met in infancy, Dr. Hanley said. This has grave implications for a child. The child will form superficial relationships and attachments, not well discriminated, and she will suffer extreme problems of lack of intimacy. Relationships with friends, co-workers, supervisors and spouses will all be potentially compromised. It is a condition that will remain with her throughout her life. CT Page 5826
Typical of children who have suffered abuse, they both love and do not love their abuser. Dr. Hanley testified that people model themselves after their family of origin and, without outside help and motivation, the child will not change. Dr. Hanley testified that, developmentally, Moriah is at an age which requires attachments that will confirm that she will be treated in a reliable, dignified manner. She was socially immature, being at approximately age two, socially, when first presented for treatment. She has progressed in therapy to age four, socially. She is significantly attached to her foster family. She must have structure, discipline, affection, support and consistency if she is to manage her anxieties and fears in a constructive way. "She needs somebody to hold her and love her and talk to her softly and sing to her." Moriah does not want to return to Eileen. Her mother brings up memories that are very difficult for Moriah to manage.
Eileen does love Moriah. She has made some attempts to meet the court approved expectations for her rehabilitation. But to rehabilitate herself to the parental role required for Moriah's care and development, Eileen would have to acquire above average parenting skills. Her personal development is, at best, marginal. She was seriously compromised in her family of origin. (Exhibit # 17). She ". .exposed the children to domestic violence, chaos, residential transience, and discontinuous and confusing relationships." She is now living with a person who has severe personal disabilities.
Dr. Mantell, the court appointed clinical psychologist, evaluated Keith. Keith was not able to recite the alphabet correctly, could not do serial 3's, and did poorly on proverbs. Keith has a personality disorder with antisocial, self-defeating, depressive and dependent features. "The personality features are considered chronic. The profile indicates a person with a history of mood disturbance, resentments, impulsivity, and unresolved dependency problems." (Exhibit #17). Dr. Mantell concluded that both Keith and Eileen are of below average ability and will have great difficulty coping in order to generate a stable life for themselves in the future, let alone their damaged children."
Dr. Mantell concluded his analysis of the mother, Keith and the three children as follows:
 All three children will need long term mental health treatment. CT Page 5827 I feel that permanency planning is in the best interest of all three children and that it is strongly contrary to their needs to allow further time to elapse. The case histories of the three children show the terrible price the children have paid for a lack of structure, nurturance, and continuity in their lives. Permanency in relationships is a cornerstone for a potential rehabilitation. Their severely compromised condition and symptom profiles are unlikely to have arisen from neglect alone. The sexualized behavior of Moriah and Kara points to overstimulation through direct sexual contact."
The court concludes from the evidence that Eileen's constant moving and leaving the children with other caretakers resulted in physical abuse and sexually inappropriate behavior to Moriah while she was in the care of Eileen, Keith and Eileen's parents.
With respect to Eileen's rehabilitative efforts, DCF offered appropriate and timely services including anger management, substance abuse, parenting skills and individual counseling. Eileen did not eagerly participate. She seriously resisted and failed to complete programs. On December 16, 1996, Eileen was convicted of larceny and placed on probation. One of the conditions of probation was that she undertake anger management as well as substance abuse counseling. In December, 1997, a warrant was issued for violation of probation (Exhibit # 14) on the report of her therapist that she had not attended therapy since June 27, 1997. Eileen explains the failure to attend as insurance problems and miscommunication through her service provider.
Eileen has completed a twelve session drug counseling program at the Community Prevention and Addictions Services program (Exhibit # A). Between January 8, 1998, and March 5, 1998, Eileen attended a program entitled "How to talk so kids will listen and listen so kids will talk." (Exhibit C D).
But the proof is in the pudding. Here, Eileen has a long-standing history of involvement with abusive men and profoundly poor parenting. Notwithstanding all her counseling, she has renewed her relationship with a chronically personality disordered, criminally involved, antisocial man. Even if Eileen had made some modest improvements in her parenting skills, which is not certain, her position as a parent would still be risky and fragile. But taken together with her intention of marrying Keith, the risks presented are intolerable. Eileen's skills as a parent, if improved, would be in the low average range. The CT Page 5828 children, especially Moriah, need above-average parenting, clearly not within the foreseeable reach of Eileen. Moriah is situated in a therapeutic foster home with her sister Kara. She is deeply bonded to the foster mother. She distrusts her mother and wishes to remain in the safe, stable, nurturing home.
ADJUDICATION
With respect to the statutory grounds for termination of parental rights the court finds by clear and convincing evidence that this child was previously found to be have been neglected on April 12, 1996 (Potter, J.) The court further finds the mother has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child that she could assume a responsible position in the life of this child. G.S. § 17a-112
(c)(3)(B).
The child, Moriah, has been abandoned by the father in the sense that the male biological parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. G.S. 17a-112 (c)(3)(A). Further, the father has no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met, on a day to day basis, the physical, emotional, moral and educational needs of the child and that to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; General Statutes Sec. 17a-112 (c)(3)(D). The court finds that these grounds have existed for more than one year.
MANDATORY FINDINGS;
With respect to the mandatory factual findings required by General Statutes § 17a-112 (e), they do not apply to the consenting father
1) The timeliness, nature and extent of services offered. The court finds that parental, psychological and psychiatric services were offered, visitation was offered and specialized foster care was provided by DCF. See facts set forth in the body of this decision and Reasonable efforts described in Exhibit #18 pp. 11-12.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act CT Page 5829 of 1980. The mother had enough time to demonstrate her desire and concern for reunification and to achieve rehabilitation. The plan of the agency was to offer services to Eileen that would assist in her rehabilitation. The mother of the child was offered services she initially did not choose to accept. Only belatedly and tepidly, bid she enter counseling. It is not clear that, even to this day, she recognizes the magnitude of her poor parenting and the impact of her immediate family on these children. Her renewed relationship with Keith undermines any belief that she has rehabilitated herself. The action of DCF to institute termination proceedings is consistent with the federal law designed to eliminate foster care drift. The father is unable or unwilling to benefit from reunification efforts and therefore these efforts are not appropriate. § 17a-112 (c)(1).
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that the mother did belatedly fulfill or comply with the expectations, described more fully in the social study. She claims to have been sober since May 22, 1997. Although there have been no urine screens recently performed, the court believes Eileen. Her sobriety is threatened by her present involvement with Keith and the stresses which that is likely to produce.
4) The feelings and emotional ties of the child with respect to the parents and foster parents, etc. The court finds that the child is bonded to her present foster family, considers herself part of the family and that no presently existing emotional bonds will be broken by termination of the parents rights.
5) As to the age of the child. The child is seven years of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. Inre Juvenile Appeal (84-CD), 189 Conn. 276 (1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979).
6) The efforts the parent have made to adjust their circumstances or conditions. The court finds that the mother has been unsuccessful in making any meaningful attempt to adjust her circumstances, conduct or condition to facilitate her personal rehabilitation. She has not CT Page 5830 been able to achieve the level of personal rehabilitation that would generate confidence that he can parent this special needs child. Her own rehabilitation is questionable and fragile. The father has no relationship and has made no known efforts.
7) The court finds that there has been nothing to prevent the parents from maintaining a meaningful relationship with the child. There was no unreasonable conduct noted by DCF. The child's reaction to the visitation robustly indicated that continued visitation was not appropriate.
DISPOSITION
Based upon the foregoing findings, the court determines that it is in the Moriah's best interest for a termination of parental rights to enter with respect to the mother, Eileen P., and to the male biological parent, Brian H., and, accordingly, a termination of their parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent for this child for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the court's direction that they receive first consideration. The commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as required by State and federal law.
Francis J. Foley, Presiding Judge Child Protection Session
[2] The exact nature of Moriah's conduct would be indelicate to describe, but is consistent with conduct of a female child who has been sexual abused. This same type of selfabusive and sexually inappropriate conduct occurred again following resumed visits with her mother. Per Dr. Hanley's recommendations, visits were discontinued. See Exhibit #18, page 15, C. for a summary of Moriah's disclosures.