[No. G029019. Fourth Dist., Div. Three. Dec. 10, 2001.]

Adoption of ALEXANDER M., a Minor.
MARK L., Plaintiff and Appellant, v.
MARCI S., Defendant and Respondent;
JOHN M. et al., Interveners and Respondents.

[No. G029355. Fourth Dist., Div. Three. Dec. 10, 2001.]

JOHN M. et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
MARK L. et al., Real Parties in Interest.

**COUNSEL**

Jeffrey W. Doeringer for Plaintiff and Appellant and for Real Party in Interest Mark L.

Kevin B. Gibbs for Defendant and Respondent and for Real Party in Interest Marci S.

Van Deusen, Youmans & Walmsley, Ted R. Youmans, John L. Dodd and Lisa A. DiGrazia for Interveners and Respondents and for Petitioners.

**OPINION**

**O'LEARY, J.—**

### FACTS

Marci S., a married woman, engaged in a brief sexual relationship with Mark L. in late December 2000, during which they conceived a child. A petition to dissolve Marci's marriage had been filed in January 1997, but she had not obtained a final judgment of dissolution. The child, named Alexander, was born in September 2000, and Marci immediately relinquished

him for adoption to John and Michelle M. A few days later, Mark visited Marci, and she told him about the impending adoption.

The M.'s served Mark with a notice of alleged paternity and adoption and filed a petition for adoption. Two weeks later, they filed a petition to terminate Mark's parental rights and to determine the necessity of his consent to the adoption (the Consent Petition). Mark filed a petition to establish a parental relationship, seeking a blood test to determine whether Alexander was his child and, if so, to obtain custody or visitation (the Paternity Petition). He declared he had agreed to pay for Marci to have an abortion if she confirmed the child was his, but four months into her pregnancy, Marci had changed her mind and asked him if he would agree to adoption. Mark said he would not agree to anything "unless and until I had some medical confirmation that I was the father." Mark did not see Marci again until after the baby was born.

Genetic testing established that Mark was Alexander's biological father. The parties stipulated to consolidate the Consent Petition and the Paternity Petition for hearing, which was held on December 19 before Commissioner Julian Cimbaluk in the probate department. Mark's request for visitation was denied, counsel was appointed to represent Alexander, and the matter was set for trial on March 6, 2001. Shortly after leaving the courtroom, however, counsel were called back by the clerk because Commissioner Cimbaluk had noticed, apparently for the first time, that Marci was married, meaning that her husband was Alexander's presumed father. This turn of events caused Commissioner Cimbaluk to realize that the case was governed by Family Code section 7631, which allows an alleged biological father of a child who also has a presumed father to establish paternity and suspend adoption proceedings. After briefing and argument on the effect of Family Code section 7631, Commissioner Cimbaluk vacated the previous consolidation order, suspended the Consent Petition and related adoption proceedings, and transferred the Paternity Petition to the family law court.[1]

In family law court, Mark filed an order to show cause for custody, visitation, and paternity; the M.'s were permitted to join, and the matter was heard in March before Commissioner David S. Weinberg. The court entered a judgment of paternity but denied Mark's request for visitation, "without prejudice to [Mark's] making said request in the adoption matter (AD72305), currently pending but temporarily suspended. The Court finds the adoption matter was suspended and sent to Family Law Court for the

[1]The M.'s petitioned this court for a writ of mandate to stay the transfer of the Paternity Petition to the family law court; their petition was summarily denied. (*John M. v. Superior Court* (Feb. 15, 2001, G028599) [nonpub. opn.].)

purpose of establishing Paternity. Having done so, the Court finds it is appropriate to return the matter, for a determination of all other issues, to the pending adoption proceeding."

Back in the probate department, the M.'s moved to set a trial date on the Consent Petition. Mark argued Family Code section 7631 prohibits the action until the Paternity Petition is final and claimed it cannot be final until custody and visitation are adjudicated. After reviewing the legislative history, Commissioner Cimbaluk agreed and denied the M.'s' motion, retaining jurisdiction over the family law issues of custody and visitation and assigning them to himself for hearing and determination.

Mark appeals from the portion of Commissioner Weinberg's order that failed to adjudicate custody and visitation, claiming it violates Family Code section 7631's requirement that the paternity action be final before adoption proceedings can continue.[2] The M.'s seek mandamus relief from Commissioner Cimbaluk's order that custody and visitation must be adjudicated before their Consent Petition, claiming Commissioner Cimbaluk misinterpreted Family Code section 7631 and, in light of *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216], must hear their Consent Petition first. We issued a stay of all proceedings, issued an order to show cause, and consolidated the appeal and the writ petition.

## DISCUSSION

Family Code section 7631 provides: "Except as to cases [where paternity is conclusively presumed, i.e., where a child is born to a woman cohabiting with her husband], a man not a presumed father may bring an action for the purpose of declaring that he is the natural father of a child having a presumed father under Section 7611, if the mother relinquishes for, consents to, or proposes to relinquish for or consent to, the adoption of the child. An action under this section shall be brought within 30 days after (1) the man is served as prescribed in Section 7666 with a notice that he is or could be the father of the child or (2) the birth of the child, whichever is later. The commencement of the action suspends a pending proceeding in connection with the adoption of the child until a judgment in the action is final."

Mark claims Family Code section 7631 gives him the right to adjudicate the issues of custody and visitation in family court under the detriment standard and burden of proof of Family Code section 3041 (former

---

[2]Mark also challenged the order by filing petitions for mandamus and supersedeas; both were summarily denied. (*Mark L. v. Superior Court* (Apr. 25, 2001, G028965) [nonpub. opn.]; *Adoption of Alexander M.* (May 17, 2001, G029019) [nonpub. opn.].)

Civ. Code, § 4600). He asserts that "the family court cannot deny him the right to assert the full panoply of rights open to plaintiff-fathers in a paternity adjudication. [He] also asserts that the denial of his right to proceed in family court denies him the constitutional right to establish and enjoy the father-child relationship." The M.'s, for their part, argue Family Code section 7631 simply grants an unwed natural father the same standing to challenge a proposed adoption where the child has a presumed father as where the child does not.

Family Code section 7631 is best understood in the context of its statutory framework. In 1975, the Legislature enacted the Uniform Parentage Act (UPA) as former Civil Code sections 7000-7021 (now Fam. Code, §§ 7600-7730).[3] Although the UPA was intended to "provide[] a comprehensive scheme for judicial determination of paternity" (*Michael M. v. Giovanna F.* (1992) 5 Cal.App.4th 1272, 1278 [7 Cal.Rptr.2d 460]), the Legislature perceived a loophole in the law, which it remedied in 1979 by enacting Senate Bill No. 540. This bill added subdivision (d) of former Civil Code section 7006 (now Fam. Code, § 7631) and amended former Civil Code section 7017 (now Fam. Code, §§ 7660-7666). (Stats. 1979, ch. 752, §§ 1-2, pp. 2607-2610.)

■ The UPA "creates three classes of parents: mothers, fathers who are presumed fathers, and fathers who are not presumed fathers." (*Adoption of Michael H., supra*, 10 Cal.4th at p. 1051.) A man is rebuttably presumed to be the natural father of a child if (1) the child is born during his actual or attempted marriage to the mother or within 300 days after its termination; (2) he marries the mother after the child's birth and is either named on the birth certificate or agrees to support the child; or (3) "[h]e receives the child into his home and openly holds out the child as his natural child." (Fam. Code, § 7611, subd. (d); former Civ. Code, § 7004, subd. (a).) A biological father may or may not qualify as a presumed father. "[T]o become a presumed father, a man who has neither married nor attempted to marry his child's biological mother must not only openly and publicly admit paternity, but must also *physically* bring the child into his home." (*Adoption of Michael H., supra*, 10 Cal.4th at p. 1051.)

In 1979, before Senate Bill No. 540 was enacted, only presumed fathers could block an adoption. If a child had a presumed father, his consent was

---

[3]"Effective January 1, 1994, the Legislature repealed the Civil Code sections governing adoption and reenacted them as part of the new Family Code. (Stats. 1992, ch. 162, §§ 4, 10.) There is no substantive difference between the relevant sections of the Family Code and their predecessors in the Civil Code." (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1049, fn. 1 [43 Cal.Rptr.2d 445, 898 P.2d 891, 61 A.L.R.5th 769].)

required. (Former Civ. Code, § 7017, subd. (a).) If a child did not have a presumed father, all possible fathers were entitled to notice of pending adoption proceedings, but only those who could qualify as presumed fathers after a court hearing were entitled to block the adoption. (Former Civ. Code, § 7017, subdivision (d).)[4] Although the statute provided that an alleged natural father of a child without a presumed father could bring an action "to determine the existence of the father and child relationship" (former Civ. Code, § 7006, subd. (c)),[5] this had no effect on a pending adoption unless he could also qualify as a presumed father.

The case of *Adoption of Marie R.* (1978) 79 Cal.App.3d 624 [145 Cal.Rptr. 122] provided the impetus for Senate Bill No. 540. There, the baby was conceived while the mother was engaged to be married to Charles K. The mother broke off the engagement, and although Charles wanted to keep the baby, she decided to place the child for adoption. Charles offered to pay for the mother's prenatal support and expenses of birth, but she refused. She also refused to allow him to receive the baby into his home. Three days before the baby's birth, the mother married Scott R.; when the baby was two days old, the mother placed her with prospective adoptive parents.

The trial court found Charles was a presumed father under former Civil Code section 7004, subdivision (a)(4) (now Fam. Code, § 7611, subd. (d)) because he " 'constructively received the baby as his own, although actual receipt of the baby was prevented by the natural mother.' " (*Adoption of Marie R., supra,* 79 Cal.App.3d at p. 626.) The appellate court reversed, finding Charles could not be a presumed father absent actual contact with the child. "The cases have recognized that a mother may, by her conduct, prevent a natural father from securing even the minimal contact with the child that [former Civil Code section 7004, subdivision (a)(4)] required." (*Id.* at p. 630.)

Senator Robert Presley sponsored Senate Bill No. 540 in response to *Marie R.,* which involved one of his constituents (apparently Charles). (Dept.

[4]"If the natural father or a man representing himself to be the natural father, claims custodial rights, the court shall proceed to determine parentage and custodial rights in whatever order the court deems proper. If the court finds that the man representing himself to be the natural father is a presumed father under subdivision (a) of Section 7004, then the court shall issue an order providing that the father's consent shall be required for an adoption of the child. In all other cases, the court shall issue an order providing that only the mother's consent shall be required for the adoption of the child." (Former Civ. Code, § 7017, subd. (d).)

[5]"An action to determine the existence of the father and child relationship with respect to a child who has no presumed father under Section 7004 or whose presumed father is deceased may be brought by the child or personal representative of the child, the State Department of Social Services, the mother or the personal representative or a parent of the mother if the mother has died or is a minor, a man alleged or alleging himself to be the father, or the personal representative or a parent of the alleged father if the alleged father has died or is a minor." (Former Civ. Code, § 7006, subd. (c).)

of Social Services, Enrolled Bill Rep. on Sen. Bill No. 540 (1979-1980 Reg. Sess.) Sept. 14, 1979.) The problem perceived was "that a natural father cannot stop the adoption proceedings even though the child's natural mother and the presumed father married before the child's birth only for the purpose of establishing paternity under the presumption of [Civil Code section] 7004(a)(1), thereby allowing the presumed father to consent to the adoption over the objections of the purported natural father." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 540 (1979-1980 Reg. Sess.) as amended Apr. 16, 1979, p. 2.) The declared purpose of the bill was to "provide that where paternity is rebuttably presumed, a man other than the presumed father may also bring an action to have himself declared to be the natural father of a child." (Sen. Bill No. 540 (1979-1980 Reg. Sess.) as introduced Mar. 12, 1979.) Early versions required the man's consent to the adoption if he were found to be the natural father, unless the court determined he should not have custody of the child. (Sen. Amend. to Sen. Bill No. 540 (1979-1980 Reg. Sess.) Apr. 24, 1979.)

After the bill emerged from the Assembly, however, the language about consent and custody was deleted, the action was restricted to situations where the child was being relinquished for adoption, and subdivision (d) of former Civil Code section 7006 was enacted in virtually the same form as it exists today in Family Code section 7631. The bill also added language to subdivision (c) of former Civil Code section 7006, dealing with an action to establish a father and child relationship where no presumed father exists (see fn. 5, *ante*), that was substantially similar to the last sentence in the newly enacted provision allowing a man to bring an action to declare himself the natural father when a presumed father exists: "The commencement of such an action shall suspend any pending proceeding in connection with the adoption of such child, including a proceeding pursuant to subdivision (b) of Section 7017, until a judgment in the action is final." (Assem. Amend. to Sen. Bill No. 540 (1979-1980 Reg. Sess.) Aug. 27, 1979.)

The rights of unwed fathers have evolved since 1979. A series of United States Supreme Court cases established that unwed fathers have rights grounded in constitutional due process and equal protection to establish a relationship with their children if they demonstrate a full commitment to the responsibilities of parenthood. "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to

his opinion of where the child's best interests lie." (*Lehr v. Robertson* (1983) 463 U.S. 248, 262 [103 S.Ct. 2985, 2993-2994, 77 L.Ed.2d 614], fn. omitted; see also *Caban v. Mohammed* (1979) 441 U.S. 380 [99 S.Ct. 1760, 60 L.Ed.2d 297]; *Quilloin v. Walcott* (1978) 434 U.S. 246 [98 S.Ct. 549, 54 L.Ed.2d 511]; *Stanley v. Illinois* (1972) 405 U.S. 645 [92 S.Ct. 1208, 31 L.Ed.2d 551].)

Unwed fathers' rights in California were greatly expanded, albeit briefly, in 1984 when our Supreme Court decided *In re Baby Girl M.* (1984) 37 Cal.3d 65 [207 Cal.Rptr. 309, 688 P.2d 918]. *Baby Girl M.* held an unwed natural father's rights were no different from a mother's and could not be terminated in connection with an adoption proceeding without a finding that "an award of custody to a parent would be detrimental to the child" under former Civil Code section 4600 (now Fam. Code, § 3041). (*In re Baby Girl M., supra*, 37 Cal.3d at pp. 69-70.) In 1986, however, the Legislature repudiated the holding in *Baby Girl M.* by adding subdivision (d)(2) to former Civil Code section 7017. (Stats. 1986, ch. 1370, § 2, pp. 4903-4905.) The new provision expressly provided that Civil Code section 4600 did not apply to the termination of the natural father's parental rights in the face of a proposed adoption and specified the court could consider only the best interests of the child in determining whether the natural father should retain his parental rights.[6]

 Thus, the statutory scheme, as it currently stands, is this: A biological father who is not a presumed father can petition the court to establish his legal status as the child's father (former Civ. Code, § 7006, subds. (c) & (d), now Fam. Code, §§ 7630, 7631), but the petition of the mother or the prospective adoptive parents to terminate his parental rights will be granted unless he proves that it is in the child's best interest that the adoption not proceed (former Civ. Code, § 7017, subds. (b) & (d), now Fam. Code, §§ 7662, 7664). "[T]he trial court's determination is frequently that the child's interests are better served by a third party adoption than by granting custody to the unwed natural father." (*Adoption of Kelsey S., supra*, 1 Cal.4th at p. 824.)

---

[6]The 1986 legislation also deleted the last sentence of former Civil Code section 7006, subdivision (c), "The commencement of such an action shall suspend any pending proceeding in connection with the adoption of such child, including a proceeding pursuant to subdivision (b) of Section 7017, until a judgment in the action is final," and substituted the following: "Such an action shall be consolidated with a proceeding pursuant to subdivision (b) of Section 7017 [if a proceeding has been filed under section 7017]. The parental rights of the alleged natural father shall be determined as set forth in subdivision (d) of Section 7017." (Stats. 1986, ch. 1370, § 1, p. 1370; *id.*, ch. 1408, § 3, p. 4922.) This language exists today, substantially unchanged, in Family Code section 7630, subdivision (c). It was not deleted from Family Code section 7631 (former Civ. Code, § 7006, subd. (d)).

In *Kelsey S.*, the California Supreme Court acknowledged the limits of an unwed father's statutory rights. Kelsey's unwed mother planned to place the child for adoption at birth; the natural father objected, desiring to raise her himself. The father made "diligent and legal attempts to obtain custody of his child" (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 821), but the mother gave custody of Kelsey to the prospective adoptive parents and refused to allow the father any contact with her. The father filed a petition to establish a parental relationship under former Civil Code section 7006; the prospective adoptive parents filed an adoption petition and a petition to terminate the father's parental rights under former Civil Code section 7017. The two proceedings were consolidated, and the trial court determined that Kelsey's best interest required termination of the father's parental rights.

The Supreme Court found the Legislature expressly distinguished between "presumed fathers and fathers who attempt unsuccessfully to gain custody." (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 827.) Because the mother had frustrated the father's attempts to attain the status of presumed father by receiving the child into his home, he was effectively denied the right to block the adoption under the statute.

The court went on, however, to examine the constitutionality of the Legislature's clear intent "to provide natural fathers with far less rights than both mothers and presumed fathers have under California's statutory system." (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 844.) After an extensive review of the case law, the court held the statutory definition of a presumed father in former Civil Code section 7004, subdivision (a) and the related statutory scheme were unconstitutional "*to the extent* [they] allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. ▇ Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (*Adoption of Kelsey S., supra,* at p. 849, original italics, fn. omitted.) If an unwed father fails to demonstrate a full commitment to his parental responsibilities, the statutes are constitutionally sufficient as applied to him. (*Id.* at pp. 849-850.)

The Supreme Court then outlined the procedure to be followed when an unwed father seeks to assert his parental rights—the "*Kelsey S.* hearing." It

clearly directed the trial court on remand to take evidence and decide "the threshold constitutional question of whether petitioner demonstrated a sufficient commitment to his parental responsibilities . . . in the first instance." (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 850.) If the trial court found no such demonstration, "that will be the end of the matter" because the best interest question has already been determined. (*Ibid.*) If the trial court found the required commitment, however, it would proceed to the question of whether the father was statutorily unfit and thus could be deprived of his right to withhold consent. "[A]ny finding of petitioner's unfitness must be supported by clear and convincing evidence. Absent such evidence, he shall be permitted to withhold his consent to the adoption." (*Id.* at p. 851.) The court emphasized the threshold nature of the consent determination. "If petitioner fails to establish on remand that he has a right to withhold his consent, there will be no question as to whether he should have custody of the child. If, however, the trial court concludes that petitioner has a right to withhold consent, that decision will bear only on the question of whether the adoption will proceed. Even if petitioner has a right to withhold his consent (and chooses to prevent the adoption), there will remain the question of the child's custody." (*Ibid.*)

 The M.'s filed a petition for adoption, gave Mark notice that he might be a natural father, and filed a petition to terminate his parental rights on the Judicial Council form entitled "Petition to Determine Parental Rights of Alleged Natural Father and to Determine Necessity of Consent FC 7660"; they checked the box indicating Marci was married when the child was born. Mark filed a "Petition to Establish Parental Relationship" on a Judicial Council form referencing Family Code section 7630, subdivision (c) (former Civ. Code, § 7006, subd. (c)). As required, the two petitions were consolidated. "An action under this subdivision shall be consolidated with a proceeding pursuant to Section 7662 if a proceeding has been filed under Chapter 5 (commencing with Section 7660). The parental rights of the alleged natural father shall be determined as set forth in Section 7664." (Fam. Code, § 7630, subd. (c).)

Mark claims, as Commissioner Cimbaluk found, that because Marci's legal husband is rebuttably presumed to be Alexander's natural father under Family Code section 7611, his action to establish a parental relationship under Family Code section 7630 should have been an action to declare himself a natural father of a child having a presumed father under Family Code section 7631. While this is undoubtedly true, Mark's further claim (and Commissioner Cimbaluk's further finding) that this circumstance changes the entire course of the adoption consent proceeding prescribed by *Kelsey S.* cannot be true. Mark asserts that now that he has been adjudicated the

natural father, he has the right to have custody and visitation determined under the "detriment to the child" standard of Family Code section 3041 (former Civ. Code, § 4600) rather than the "best interest of the child" standard in Family Code section 7664, subdivision (b) (former Civ. Code, § 7017, subd. (d)(2)). If the prospective adoptive parents could not prove it would be detrimental to Alexander for Mark to have custody or visitation (a heavy burden), Mark would then be able to establish his status as a presumed father by receiving Alexander into his home. Seizing on the final sentence of Family Code section 7631, "The commencement of the action suspends a pending proceeding in connection with the adoption of the child until a judgment in the action is final," Mark argues the Legislature intended to give him just such a chance when it passed Senate Bill No. 540 in 1979.

Whatever the Legislature sought to accomplish by the 1979 legislation, the current statutory scheme and the relevant case law do not permit such an interpretation. Although *Kelsey S.* and its progeny have involved circumstances where no presumed father exists, there is nothing in the language or analysis of these cases to suggest their holdings apply only to those circumstances. Family Code section 7631 allows Mark to establish "that he is the natural father" and rebut the presumption that Marci's legal husband is the natural father; before 1979, a father in Mark's situation did not have that right. Having established that he is the natural father, Mark can now attempt to prove he has demonstrated a full commitment to his parental responsibilities so as to be entitled to the benefit of the detriment to the child standard under Family Code section 3041. If he is unable to do so, he must prove that retention of his parental rights, rather than adoption by the M.'s, is in Alexander's best interest.

## DISPOSITION

Let a writ of mandate issue commanding the superior court to hold a hearing on the M.'s' petition to terminate Mark's parental rights under Family Code section 7664, subdivision (b), first taking evidence on whether Mark's consent to the adoption is required under *Kelsey S.* and *Michael H.* Mark's appeal from Commissioner Weinberg's ruling is dismissed as moot. The stay of all proceedings is lifted. The M.'s are entitled to costs.

Rylaarsdam, Acting P. J., and Bedsworth, J., concurred.