Filed 7/6/21  Larry R. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| LARRY R., | F082124 |
| Petitioner, | (Super. Ct. No. 13CEJ300141-2) |
| v. | |
| THE SUPERIOR COURT OF FRESNO COUNTY, | **OPINION** |
| Respondent; | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, | |
| Real Party in Interest. | |
| In re R.B., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, | F082118, F082129 |
| Plaintiff and Respondent, | (Super. Ct. No. 13CEJ300141-2) |
| v. | |
| SHANNON B. et al., | |
| Defendants and Appellants. | |

# THE COURT[*]

APPEALS from an order of the Superior Court of Fresno County. Brian M. Arax, Judge. ORIGINAL PROCEEDINGS; petition for extraordinary writ review.

Larry R. in pro. per. for Petitioner; and Katie Curtis, under appointment by the Court of Appeal, Defendant and Appellant Larry R.

Melissa A. Chaitin, under appointment by the Court of Appeal, for Defendant and Appellant Shannon B.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Real Party in Interest and for Plaintiff and Respondent.

No appearance for Respondent.

-ooOoo-

Larry R. is the biological father of now two-year-old R.B. (the baby). When the baby was born, her mother Shannon B. (mother) was married to Joseph B. Dependency proceedings were initiated in August 2019 when the baby was removed because of mother's substance abuse. Larry first appeared at the dispositional hearing in January 2020 and over the ensuing year established his biological paternity and attempted to acquire status as a *Kelsey S.*[1] father and attain custody or reunification services. Meanwhile, the juvenile court denied mother reunification services and ordered services for Joseph. At a paternity hearing in November 2020, the court found Larry is not a *Kelsey S.* father and denied him reunification services as a biological father, finding services would not benefit the baby. (Welf. & Inst. Code, § 361.5, subd. (a).)[2] Larry appealed and filed a modification petition (§ 388) (section 388 petition) seeking placement. Mother joined in Larry's appeal. At a contested six- and 12-month review hearing on December 2, 2020, the juvenile court summarily denied Larry's section 388

---

[*]      Before Meehan, Acting P.J., Snauffer, J. and DeSantos, J.

[1]      *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).

[2]      Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

petition, terminated reunification services for Joseph and set a section 366.26 hearing for March 24, 2021.

While Larry and mother's appeals were pending, Larry filed an extraordinary writ petition, in propria persona, seeking relief from the juvenile court's order setting a section 366.26 hearing. (Cal. Rules of Court, rules 8.450−8.452.)[3] He contends the juvenile court erred in finding he is not a *Kelsey S.* father. He further contends Joseph was not the conclusively presumed father. (Fam. Code, § 7540.) Therefore, the court should have ordered reunification services for him.

On our own motion, we consolidated the appeals and the extraordinary writ petition to decide a common issue and stayed the section 366.26 hearing pending our review of the case. We reverse the juvenile court's finding Larry is not a *Kelsey S.* father, remand the case with instructions, dismiss the extraordinary writ petition and lift the stay.

### PROCEDURAL AND FACTUAL SUMMARY

*Dependency Proceedings Prior to Larry's Appearance*

In the early morning of August 1, 2019, police officers found mother passed out in the front seat of her car with the baby, then seven weeks old, in the back seat. Mother admitted smoking methamphetamine the evening before. The officers found three syringes and a methamphetamine pipe in her purse. She was homeless and admitted she was not capable of caring for the baby. Joseph arrived and asked if he could take the baby home. However, he could not verify his address. The police placed a protective hold on the baby and the Fresno County Department of Social Services (department) took her into protective custody.

Mother and Joseph were known to the department because of their history of neglect involving their four children (ages six to 15) who were in the care of their maternal grandmother. The parents also had an unstable relationship and extensive criminal histories.

---

**3**      Rule references are to the California Rules of Court.

Mother's criminal history dated back to 2002 and included a series of misdemeanor convictions for drug-related offenses. Joseph's history dated back to 2001 and included felony convictions for drug- and theft-related offenses.

The department filed a dependency petition, alleging mother's ongoing methamphetamine use placed the baby at a substantial risk of harm. The petition listed Joseph as the baby's presumed father.

On August 6, 2019, the investigating social worker spoke with a former neighbor of mother and Joseph. The neighbor said they were last seen at the RV park on June 30, 2019. They were evicted for leaving the children unsupervised and not paying their bill. The neighbor knew mother was pregnant because she told people she did not want to keep the baby and was going to give it up for adoption. Joseph denied the baby, stating it may not be his and he did not want the child.

On August 12, 2019, the department amended the petition, adding an allegation that Joseph failed to protect the baby from mother. The juvenile court ordered the baby detained on the first amended petition, offered the parents services pending its disposition of the case and set a jurisdictional/dispositional hearing (combined hearing) for October 2, 2019.

On September 26, 2019, the department submitted its report for the combined hearing. The department recommended the juvenile court adjudge the baby a dependent child, order reunification services for Joseph and deny mother services because of her chronic and untreated substance abuse (§ 361.5, subd. (b)(13)).

The juvenile court sustained the petition and continued the dispositional hearing to January 22, 2020. On November 25, 2019, the baby was placed with caregivers where she remained.

*Larry Appeared at the Dispositional Hearing and Requested Paternity Testing*

Larry appeared at the dispositional hearing on January 22, 2020, for the first time in the proceedings. Joseph was also present. Joseph stated he and mother were not living together

4

when the baby was born. Larry requested paternity testing. He understood he could be financially responsible if found to be the biological father. The juvenile court amended the petition, listing Larry as an alleged father, appointed counsel for him and ordered him to take a paternity test. The court set a settlement conference on March 4, 2020, and a contested dispositional hearing for April 1, 2020.

Larry filed a "Statement Regarding Parentage" (JV-505) asserting he and mother were sexually involved at the time of the baby's conception.

After Larry appeared in the proceedings, Joseph absented himself from all future hearings and stopped communicating with the department.

On February 28, 2020, the department submitted an interim report for the March 4, 2020 hearing, in which it reiterated its recommendations regarding services and notified the juvenile court that Larry was scheduled for a paternity test on February 20, 2020, but missed the appointment. He contacted the social worker on February 25 and said he got his dates mixed up and thought he was supposed to test on March 4. He asked to reschedule. The social worker completed a referral on February 28 and the date to retest was pending. The department also reported that the baby was doing well in her foster placement. Mother continued to visit but was not active in any services. Joseph was not visiting or participating in any reunification services.

On March 4, 2020, the juvenile court denied Larry's JV-505, finding Larry was not a presumed father under Family Code section 7611, subdivision (d) because he never lived with mother and never provided for the baby. The contested dispositional hearing set for April 1 was continued in part because of the COVID-19 pandemic and was conducted on June 10, 2020.

On June 10, 2020, Larry appeared at the dispositional hearing and again stated he wanted to test for paternity. Counsel for the department advised the court that Larry's paternity test had been rescheduled to July 2, 2020, because of the pandemic. The court ordered the baby removed from mother and Joseph, denied mother reunification services but ordered services for Joseph. The court explained Larry was not receiving services because he was an alleged father.

Larry's attorney requested visitation if Larry was found to be the baby's biological father.  The court granted the request.  The court set a combined six- and 12-month review hearing for December 2, 2020, and an interim review/paternity hearing for August 5, 2020.

Larry participated in paternity testing on July 2, 2020.  The results reported on July 14, 2020, established his biological paternity.

On July 6, 2020, the juvenile court granted the baby's foster parents de facto parent status.

The department submitted an addendum report for the August 5, 2020 hearing, advising the juvenile court of Larry's biological paternity and recommending the court not elevate him to presumed father status or provide him reunification services.  Larry told a social worker on July 27, 2020, that he was not aware he was a father until he was released from jail in November 2019.  He was incarcerated since January 2018 for possession of stolen items.  He was on probation and lived with his parents.  He said he completed three inpatient substance abuse programs, the latest an 18-month program through Teen Challenge in 2015.  His criminal history dated back to 2009 and included possession of a controlled substance, receiving stolen property, assault with a deadly weapon and numerous instances of driving without a license or insurance.  He served two prison terms and had two strikes.  The department did not believe Larry qualified as a presumed father because he did not provide for the baby, have an established relationship with her or hold her out as his own child.  Even if he qualified as a presumed father, he would likely satisfy the bypass provisions of section 361.5, subdivision (b)(13).  Additionally, the department did not believe it would be in the baby's best interest to provide Larry services as a biological father because of his substance abuse and criminal history.

6

*Larry is Deemed the Baby's Biological Father and Executes a Voluntary Declaration of Paternity in August 2020*

Larry and mother appeared at the paternity hearing on August 5, 2020. Larry's paternity test results were presented to the juvenile court. The court stated Larry would not qualify as a presumed father under Family Code section 7611, subdivision (d) because of "the tender age of the child and the circumstances involved." Larry's attorney informed the court Larry wanted to raise his status to presumed father and that she advised him to sign a declaration of paternity. When he contacted the department to assist him, he was "turned away." Counsel for the department explained that Larry was not allowed to enter the departmental offices and the social worker was not available. However, she agreed to help Larry and mother sign a declaration of paternity, but said the department anticipated a bypass of services under section 361.5, subdivision (b)(13). She said whether Larry was a biological or a presumed father, it was not in the baby's best interest for Larry to receive services. Larry's attorney objected to the department's assessment and requested a contested hearing. She also informed the court visitation had not been initiated.

The juvenile court deemed Larry the baby's biological father, set a contested paternity hearing for October 28, 2020, and granted the department discretion to offer Larry visitation.

On August 27, 2020, Larry and mother executed a voluntary declaration of parentage. On September 21, 2020, Larry began visiting the baby for one hour a week.

*Larry Files a JV-505 Seeking Presumed Father Status*

On October 15, 2020, Larry filed a JV-505, stating he believed he was the baby's father and asking the juvenile court to elevate him to presumed father status. Without citing to any legal authority, Larry's attorney argued in a statement of contested issues that Larry's efforts to establish a relationship with the baby upon learning of his possible paternity qualified him as a presumed father. He attended all the hearings, requested visitation, signed a voluntary declaration of paternity and asked to be assessed for services.

7

Larry's attorney also argued that section 361.5, subdivision (b)(13) did not apply to Larry because he did not resist drug treatment within three years of the filing of the petition. Instead, he successfully completed a court-ordered drug treatment program in February 2015 and had remained clean and sober since. He was employed and could financially support the baby. He also had a home and a room set up for her.

Larry's attorney also disputed the department's assertion Larry was incarcerated from January 2018 and released on November 2019. In fact, he was incarcerated from May 19 through November 2, 2019, for stealing stolen property. He was not aware the property was stolen. He did not have two strikes, but one stemming from an assault with a deadly weapon (not a firearm) in 2009. His attorney filed the criminal case summaries and asked the court to take judicial notice of the true facts. The court took judicial notice Larry had one strike.

On October 26, 2020, the department filed a section 388 petition to terminate Joseph's reunification services. He had not participated in any services or visited the baby. It also filed an addendum report recommending the court not order services for Larry because he had not participated in any family activities, outings or doctor's appointments and had not assisted the baby financially. He was unemployed and his visits were terminated early because the baby cried. He also had a recent felony conviction in May 2019 for possession of a stolen vehicle and operation of a chop shop and served a one-year jail sentence. In addition, the baby had developed a strong attachment to her caregivers. Therefore, providing Larry reunification services would not be in the baby's best interest. The court set a hearing on the petition for October 28, 2020.

*Juvenile Court Denies Larry Presumed Father Status*

On August 5, 2020, Larry and mother appeared at the paternity hearing. Larry testified he first became aware he had a child in January 2020. He appeared at the next hearing. He had a house and a room set up for the baby. As soon as he was elevated to her biological father, he contacted the department every week, asking for visits. He was told it was "just a waiting

8

game." He was employed fulltime with a local carpenter's union and had been for three years. He was living with his parents who would care for the baby while he worked. He could support her financially. He completed a year-long inpatient treatment program and had been sober since February 2014. He was drug testing for his probation officer and was able to stop testing because he was doing so well. He had support groups and a sponsor. He drug tested for the department. Larry visited the baby weekly for one hour and visits never ended early. He was able to console the baby if she cried. He taught her the colors, read her stories, and played with blocks with her. The baby sat on his lap and sought him out for comfort. He had not had the opportunity to take the baby to medical appointments or family gatherings. He had not been asked to provide for her financially but had offered.

The social worker testified Larry would not have had the opportunity to participate in family activities, outings, doctor's appointments or other activities. She did not challenge Larry's account of his visits with the baby. She testified that Larry came forward to establish his paternity in a relatively timely fashion.

In her argument, Larry's attorney conceded Larry was not a presumed father under the Family Code because he did not receive the baby into his home. (Fam. Code, § 7611, subd. (d).) However, he had not had that opportunity. Nevertheless, he established a relationship with her through visitation and was prepared to assume a parental role by taking custody of her. It would benefit the baby to establish a relationship with her biological father.

County counsel argued Joseph was the conclusively presumed father under Family Code section 7540 by virtue of the marriage and that only Joseph, mother or another presumed father under Family Code section 7611 could rebut Joseph's presumption. Since no one had rebutted Joseph's presumption, at best Larry was a biological father without any rights to custody or reunification services. County counsel argued Larry's voluntary declaration of paternity was void because of mother's marriage to Joseph. She also argued it would not benefit the baby for the court to order reunification services because she had been with the foster parents since

9

November 2019 and was bonded to them. In addition, the case had progressed beyond 12 months from the date the baby was initially removed. The 18-month cut off for services would be February 1, 2021. Even if the court were inclined to offer Larry services, there was not a substantial probability he could reunify with the baby within that short period of time.

Minor's counsel concurred Larry was not a presumed father under the Family Code and submitted the matter on the court's determination whether reunification services would benefit the baby.

Mother's attorney argued Larry qualified as a *Kelsey S*. father. He came forward as early as possible and took every step to establish his paternity and deserved Constitutional protection. When the juvenile court pointed out that Larry's attorney had not raised the issue of *Kelsey S*. in the trial, argument or in the briefing, mother's attorney asserted the issue was raised by the legal and factual issues. As it was the close of court business, the court continued the matter to November 3, 2020, to complete argument.

Mother's attorney resumed her argument father was a *Kelsey S*. father when the court resumed on November 3, 2020. She also argued there was no evidence mother was living with Joseph at the time of conception, which was required for the conclusive presumption under Family Code section 7540. Larry's attorney adopted the arguments of mother's attorney. County counsel argued *Kelsey S*. did not apply because mother did not prevent Larry from assuming his parental responsibility. Even so, he would only be entitled to notice and visitation. He would not be entitled to reunification services.

The juvenile court found a conclusive presumption of paternity existed as to Joseph under Family Code section 7540. The court did not find Larry established Joseph and mother were not cohabiting during the marriage. The court found the voluntary declaration of paternity was void because a presumed father existed at the time of its filing and it was untimely. As to whether Larry was a *Kelsey S*. father, the court considered the issue waived, citing *In re Elijah V*. (2005) 127 Cal.App.4th 576, because the facts were not established for the court to fully assess the

10

issue. Only a few of the factors were established and only in a general way. The only evidence as to when Larry knew of the baby was after he got out of jail in November 2019. There were no facts about what he did between November and January to acknowledge his paternity. There was evidence he was willing to assume custody. The court stated it did not help him that he missed the paternity test and did not know mother was pregnant. Even if the court found he was a *Kelsey S.* father, there is case authority that such a father is not a presumed father and the "better view" according to a treatise is that a *Kelsey S.* father does not meet presumed father status under Family Code section 7611.[4] The court adopted the treatise analysis and would not consider Larry a presumed father.

Further, the juvenile court did not find it was in the baby's best interest to provide Larry reunification services. Father did not have a prior relationship with the baby. The plan was for adoption and caregivers were caring for the baby. Mother and Joseph were not in reunification. The case was beyond 12 months and to begin reunification with Larry would not benefit the baby or serve the baby's best interest. The court also stated, Larry's recent conviction and probation status created an uncertainty about his future. Even if the court were to consider him a presumed father and weigh the presumptions, the court would not weigh in favor of Larry even though Joseph's record was not good either.

The juvenile court denied Larry's request for presumed father status or *Kelsey S.* status and denied him reunification services. The court found that reunification services for Larry as a biological father would not benefit the baby and ordered supervised visitation twice a month for one hour. The court confirmed the six- and 12-month review hearing for December 2, 2020.

Larry appealed the juvenile court's finding he is not a *Kelsey S.* father and, alternatively, its order denying him reunification services as a biological father. Mother joined in Larry's appeal.

---

[4]     Seiser & Kumli, California Juvenile Courts Practice and Procedure (2021 ed.) is the treatise the juvenile court cited.

11

*Larry Filed a Section 388 Petition Seeking Presumed Father Status*

On November 25, 2020, Larry filed a section 388 petition asking the juvenile court to place the baby in his care and provide him services. As changed circumstances he alleged he met the criteria for a *Kelsey S*. father and that Joseph was not a presumed father. Larry alleged placing the baby with him would be better for the baby because he had been trying to attain custody of her for 10 months and he and his family wanted to "have this little girl in their lives." They had a safe, stable and loving home. He continued to visit the baby and she called him "dada."

In points and authorities to support Larry's section 388 petition, Larry's attorney argued this was Larry's first request to be considered for *Kelsey S*. status. Larry was thwarted from establishing his paternity first by mother who failed to inform him he was the baby's father until January 2020 and then by the department who delayed arranging paternity testing. Larry missed his first testing appointment on February 20, 2020, because of a misunderstanding. He was devastated and on February 28, 2020, completed a referral for a second appointment. However, the department denied his request and made him wait until the next hearing for a court order. As a result, he was not able to test again until July 2, 2020, causing a four-month delay. The delay was unnecessary because the department did not require a court order to reschedule testing. Larry's attorney also argued the department penalized Larry because of his criminal convictions yet recommended services for Joseph despite his history of drug addiction, child neglect, unemployment and homelessness. Counsel argued Joseph was not the baby's presumed father because he and mother stated they were not living together when the baby was conceived or when she was born.

*The Juvenile Court Denied Larry's Section 388 Petition and Set a Section 366.26 Hearing*

On December 2, 2020, the juvenile court convened the combined six- and 12-month review hearing. The court summarily denied Larry's section 388 petition, finding Larry's claim to *Kelsey S*. status had been fully litigated and decided, stating, "I'm not going to

12

grant him a second trial." The court terminated Joseph's reunification services and set a section 366.26 hearing. The court ordered weekly visitation for Larry and the baby.

## DISCUSSION

*Significance of Presumed Father Status*

A man's paternity status is critical in dependency proceedings because it determines his parental rights vis-à-vis the child. "Presumed fathers are vested with greater parental rights than alleged or biological fathers." (*In re M.C.* (2011) 195 Cal.App.4th 197, 212.) Only presumed fathers have legal status as "parents," entitled to the rights afforded such persons in dependency proceedings, including the appointment of counsel, custody and reunification services. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451; §§ 317, subd. (a), 361.2, subd. (a), 361.5, subd. (a).) A biological father does not have a right to custody or services. (*Zacharia D.*, at p. 454.) However, the juvenile court may provide him services if it finds it would benefit the child. (§ 361.5, subd. (a).)

*Statutory Presumptions of Paternity*

Family Code section 7540 provides a "conclusive … presumption" of paternity if a child is conceived and born while a married couple is living together: "Except as provided in [Family Code] Section 7541, the child of spouses who cohabited at the time of conception and birth is conclusively presumed to be a child of the marriage." (Fam. Code, § 7540.) Under Family Code section 7541, either spouse, the child or a person who is a presumed parent under Family Code section 7611 may bring an action to challenge the parentage of the spouse who is a presumed parent under Family Code section 7540 no later than two years from the date of the child's birth. (Fam. Code, § 7541, subd. (b).) If the court finds that the spouse who is a presumed father under Family Code section 7540 is not a genetic parent of the child, the question of parentage must be resolved in accordance with Family Code section 7612. (Fam. Code, § 7541, subd. (a).)

13

When Family Code section 7540 does not apply, the Uniform Parentage Act (Fam. Code, § 7600 et seq.) governs presumed father status. Family Code section 7611 sets forth several rebuttable presumptions under which a man may qualify as a presumed father. Generally, the presumptions apply in situations where the child was born during, before or after a marriage or attempted marriage or the presumed parent received the child into their home and openly held the child out as their natural child. "The statutory purpose [of Family Code section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not. [Citation.]" (*In re Sabrina H*. (1990) 217 Cal.App.3d 702, 708.) A presumption under Family Code section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action by clear and convincing evidence. (Fam. Code, § 7612, subd. (a).)

*Kelsey S*.

An unwed biological father who does not satisfy any of the presumptions under Family Code section 7611 may assert constitutional paternity rights by showing he promptly stepped forward to assume full parental responsibility for the child's well-being including a financial, emotional or other commitment; the child's mother or a third party prevented him from assuming his parental responsibility or physically receiving the child into his home and he demonstrated a willingness to assume full custody of the child. (*In re Jason J*. (2009) 175 Cal.App.4th 922, 932.) Such an individual is often referred to as a *Kelsey S*. father.

*Kelsey S*. involved a child of unwed parents whose mother planned to place the child for adoption. (*Kelsey S*., *supra*, 1 Cal.4th at p. 821.) Shortly after the child's birth, the biological father filed an action to establish paternity, and the prospective adoptive parents filed an adoption petition. (*Id*. at p. 822.) The Supreme Court held that Family Code section 7611, subdivision (d) "and the related statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and

14

thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id*. at p. 849.)

Kelsey S. was extended to dependency proceedings in *In re Julia U*. (1998) 64 Cal.App.4th 532 (*Julia U*.) where an unmarried biological father challenged orders denying him reunification services and "terminating his parental rights." (*Id*. at pp. 537−539.) Echoing the holding in *Kelsey S*., the *Julia U*. court concluded that in a dependency case, "[i]f an unwed, biological father promptly comes forward and demonstrates a full commitment to his parental responsibilities, his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id*. at pp. 540−541.) *Julia U*. listed the factors the juvenile court should consider: "In determining whether a biological father has demonstrated such commitment, the father's conduct both before and after the child's birth must be considered. [Citations.] Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. [Citation.] In particular, the father must demonstrate a willingness himself to assume full custody of the child—not merely to block adoption by others. [Citation.] A court should also consider the father's public acknowledgement of paternity, his payment of pregnancy and birth expenses commensurate with his circumstances, and prompt legal action to seek custody of the child." (*Id*. at p. 541.) A *Kelsey S*. father "qualif[ies] for the same parental rights as those afforded by statute to presumptive fathers." (*Adoption of Michael H*. (1995) 10 Cal.4th 1043, 1063.)

*Standard of Review*

"When deciding whether a parent meets the requirements under *Kelsey S*., appellate courts have reviewed the ruling for substantial evidence. [Citations.] The burden is on the

15

biological parent 'to establish the factual predicate' for *Kelsey S.* rights. [Citation.] To the extent that the issue is a mixed question of law and fact, we exercise our independent judgment in measuring the facts against the applicable legal standard." (*In re Adoption of Myah M*. (2011) 201 Cal.App.4th 1518, 1539.)

In applying the substantial evidence standard, " '[w]e … determine if there is any substantial evidence, contradicted or not, which will support the conclusion of the trier of fact. [Citation.] Substantial evidence is "reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged …." [Citation.]' " (*Adoption of Emilio G*., *supra*, 235 Cal.App.4th at p.1145.) " 'We view the evidence in the light most favorable to the ruling, giving it the benefit of every reasonable inference and resolving all conflicts in support of the judgment. [Citation.] We defer to the trial court's credibility resolutions and do not reweigh the evidence. [Citation.] If there is substantial evidence to support the ruling, it will not be disturbed on appeal even if the record can also support a different ruling.' " (*In re M.Z.* (2016) 5 Cal.App.5th 53, 64.)

*Larry Is a Kelsey S. Father*

Substantial evidence supports a finding Larry meets the requirements under *Kelsey S.* He promptly stepped forward to assume full parental responsibility for the baby in January 2020[5] as soon as he learned he could be her father. He appeared at the next hearing on January 22 and completed a JV-505 requesting paternity testing. He did so understanding that he would have to financially support the baby if he were determined to be her biological father. Larry also requested visitation if the paternity test established his biological paternity. Once Larry's biological paternity was established in July 2020, Larry immediately began his efforts to elevate his status to presumed father. He executed a voluntary declaration of paternity and filed a JV-

---

[5] There is some discrepancy as to when Larry discovered he was the baby's father. According to the department, he said he was told in November 2019 after he was released from custody. Larry, however, testified that he did not find out until January 2020 and his testimony was not refuted.

16

505 seeking presumed father status. In September 2020, Larry began visiting the baby once a week. Larry was employed fulltime as a carpenter and had been so employed for three years. He lived in a house with his parents and had a room set up for the baby. His parents were available to take care of the baby while he worked.

Substantial evidence also reflects mother thwarted Larry's efforts to assume his parental responsibilities by not telling him he could be the father of her child. Mother knew Joseph was not the father; she and Joseph openly stated as much. Yet, mother did not inform Larry he was the baby's father until January 2020 when she was approximately seven months old.

Larry also demonstrated a willingness to assume full custody of the baby. He testified he had a home for her and was able to financially support her. He and his parents were committed to raising her together and providing for all her needs.

Real party in interest contends Larry cannot qualify as a *Kelsey S.* father because the juvenile court could not assess his conduct during mother's pregnancy with the baby. The record makes clear, however, that Larry did not know of mother's pregnancy and real party cites no authority that his lack of knowledge disqualifies him from attaining *Kelsey S.* status.

Real party further contends the juvenile court found Larry unfit, which also precludes a finding he is a *Kelsey S.* father. Specifically, real party asserts "[t]he juvenile court's consideration of [Larry's] incarceration, his prior criminal conviction, his minimal relationship with the child, his prior drug use, all support the implied finding there was a 'showing of his unfitness.'" Real party fails to cite any authority, however, establishing a parent's unfitness as a factor in determining whether *Kelsey S.* applies, and we are unaware of any such authority. Further, the evidence would not support such a finding. Larry had a stable job, stable housing and family support. He had been clean and sober since 2014 and was in compliance with probation.

17

*The Juvenile Court Must Weigh the Conflicting Presumptions*

Our conclusion Larry is a *Kelsey S.* father means the baby has two presumed fathers—Larry and Joseph.  However, Joseph is not a conclusively presumed father under Family Code section 7540 because he was not living with mother when the baby was born.  There was also a question as to whether he was living with her when the baby was conceived.  However, Joseph is a presumed father under Family Code section 7611, subdivision (a) by virtue of his marriage to mother at the time of the baby's birth:  "A person is presumed to be the natural parent of a child if the person meets … any of the following subdivisions:  [¶]  (a)  The presumed parent and the child's natural mother are, or have been, married to each other and the child is born during the marriage, …."

"As a general rule, ' "there can only be one presumed father." ' "  (*In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1086.)  Conflicting presumptions are addressed in Family Code section 7612, which provides in subdivision (b):  "If two or more presumptions arise under Section 7611 that conflict with each other, or if one or more presumptions under [Family Code] Section 7611 conflict with a claim by a person identified as a genetic parent pursuant to [Family Code] section 7555, the presumption that on the facts is founded on the weightier considerations of policy and logic controls."  (Fam. Code, § 7612, subd. (b).)  "[F]or purposes of resolving conflicting presumptions under section 7612, subdivision (b), a *Kelsey S.* father is the equivalent of a statutorily presumed father."[6]

In assessing the conflicting presumptions, the juvenile court must make factual findings with respect to each presumption and only then weigh which presumption is entitled to greater

---

[6]    We acknowledge the split of authority on whether a *Kelsey S.* father has the same rights as a statutorily presumed father and direct the juvenile court to accord Larry those rights though we take no official position on the matter in this case.  (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2021 ed.) § 2.60(3)b.)  In our view, to deprive a *Kelsey S.* father his full rights as a statutorily presumed father would in effect treat him as a biological father and "render *Kelsey S.* status meaningless."  (*In re M.C.*, *supra*, 195 Cal.App.4th at p. 222, fn. 13.)

weight.  (*Craig L. v. Sandy S*. (2004) 125 Cal.App.4th 36, 52.)  "The nature of each presumed father's role in the life of a child and the marital circumstances will vary from case to case and thus the trial court must make its determination under [Family Code] section 7612 on a case-by-case basis.  In resolving such conflict, the trial court must at all times be guided by the principle that the goal of our paternity statutes is 'the protection of the child's well being.' "  (*Ibid*.)

Though Family Code section 7612 serves as a guide to resolve conflicting presumptions, it does not require the trial court to determine "which *one* of the two (or more) presumptions should prevail to the exclusion of all competing presumptions, …."  (*C.A. v. C.P*. (2018) 29 Cal.App.5th 27, 38.)  Instead, effective January 1, 2014, the statute was amended to add new subdivision (c), which allows for the designation of a third parent for a child in an appropriate case.  Family Code section 7612, subdivision (c), provides:

"In an appropriate action, a court may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child.  In determining detriment to the child, the court shall consider all relevant factors, including, but not limited to, the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time.  A finding of detriment to the child does not require a finding of unfitness of any of the parents or persons with a claim to parentage."

Here, because the juvenile court did not recognize Larry as a *Kelsey S*. father, it did not assess the competing claims of Joseph and Larry under Family Code section 7612, subdivision (b) or determine whether having only two parents (mother and Joseph) would be detrimental to the baby.  Consequently, we remand the matter with directions to the juvenile court to conduct an evidentiary hearing under Family Code section 7612, subdivision (b) and make factual findings as to Larry and Joseph's claims as the baby's presumed fathers and weigh

19

their competing claims.  If the court determines that Larry's presumption of paternity is supported by weightier considerations of policy and logic, the court shall assess Larry for custody and/or services.  If the court determines that Larry is a third parent, it shall determine whether having only two parents is detrimental to the baby and make appropriate findings.

*The Extraordinary Writ Petition Fails to Comply with Rule 8.452*

The purpose of extraordinary writ proceedings is to allow the appellate court to achieve a substantive and meritorious review of the juvenile court's orders and findings issued at the setting hearing in advance of the section 366.26 hearing.  (§ 366.26, subd. (*l*)(4).)

Rule 8.452, which sets forth the content requirements for an extraordinary writ petition, requires the petitioner to identify the error(s) he or she believes the juvenile court made and to support each alleged error with argument, citation to legal authority, and citation to the appellate record.  (Rule 8.452(b).)  In keeping with rule 8.452(a)(1), we will liberally construe a writ petition in favor of its adequacy where possible, recognizing that a parent representing him or herself is not trained in the law.  Nevertheless, the petitioner must at least articulate a claim of error and support it by citations to the record.  Failure to do so renders the petition inadequate in its content and the reviewing court need not independently review the record for possible error. (*In re Sade C*. (1996) 13 Cal.4th 952, 994.)

The ruling Larry challenges was the juvenile court's order denying his section 388 petition in which he alleged he is the baby's *Kelsey S*. father and requested custody and services. Section 388 allows interested parties to petition for a hearing to change or set aside a prior court order on the grounds of "change of circumstance or new evidence."  (§ 388, subd. (a)(1).)  A petition to modify a juvenile court order under section 388 must allege facts showing new evidence or changed circumstances exist and changing the order will serve the child's best interests.  (§ 388, subd. (a)(1).)  Courts must liberally construe a section 388 petition in favor of its sufficiency.  (*In re Marilyn H*. (1993) 5 Cal.4th 295, 309−310.)  However, section 388

requires a petitioner to make prima facie showing of both elements to trigger an evidentiary hearing. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

Here, the juvenile court denied Larry's section 388 petition without conducting an evidentiary hearing, stating it had already "fully litigated" Larry's claim to *Kelsey S.* status and was not going to give Larry a second trial on the matter. Larry does not contend in his writ petition that the juvenile court erred in denying him an evidentiary hearing or explain how the evidence he alleged in his section 388 petition supported his request under section 388. In fact, Larry does not cite section 388 at all. As a result, his petition is technically inadequate for review and is dismissed.

## DISPOSITION

The juvenile court's findings Joseph is a conclusively presumed father under Family Code section 7540 and Larry is not a *Kelsey S.* father are reversed. The court is directed to enter findings Joseph is a presumed father under Family Code section 7611, subdivision (a) and Larry is a *Kelsey S.* father. The court is further directed to conduct an evidentiary hearing under Family Code section 7612, subdivision (b) and make factual findings as to Larry and Joseph's claims as the baby's presumed fathers, weigh their competing claims and determine which claim is entitled to greater weight under Family Code section 7612, subdivision (b). If the court determines that Larry's presumption of paternity is supported by weightier considerations of policy and logic, the court shall assess Larry for custody with or without family maintenance services or for reunification services. If the court determines that Larry is a third parent, it shall determine whether having only two parents is detrimental to the baby and make appropriate findings and orders, including custody and/or services for Larry if appropriate. The petition for extraordinary writ is dismissed. The order issued on December 2, 2020, setting the section 366.26 hearing for March 24, 2021, is vacated. The order staying the section 366.26 hearing is lifted. This opinion is final forthwith as to this court pursuant to rule 8.90(b)(2)(A).